362 P.2d 384

**ORE–IDA POTATO PRODUCTS, INC.,**
**Plaintiff-Appellant,**

v.

**Gene LARSEN, Defendant-Respondent.**

No. 8935.

Supreme Court of Idaho.

May 31, 1961.

Jeppesen & Jeppesen, Boise, for appellant.

James, Shaw & James, Gooding, for respondent.

KNUDSON, Justice.

In May, 1956, appellant sold and delivered to respondent a quantity of seed potatoes at an agreed price of $1,500. On June 1, 1957, the parties entered into a written contract which provided that respondent would plant, cultivate and harvest Russet potatoes on 25 acres of his farm near Gooding, Idaho; that such potato crop be harvested at respondent's expense and be delivered to appellant "in field sacks F.O.B. railroad cars at Gooding, Idaho" * * * "cars. to be loaded 50,000 lbs. min. (would like to load in bulk trucks if available)"; that respondent would be paid for such potatoes at an agreed price of $1 per cwt. for all potatoes graded 50% U. S. No. 1, with one cent up or down for each percent above or below the specified 50% U. S. No. 1; the $1,500 due from respondent to appellant on the 1956 seed sale to be deducted from the first payment made under the contract.

On October 15, 1957, respondent had a telephone conversation with a Mr. Holladay, field superintendent of appellant corporation, relative to commencing the harvesting of the potato crop. The parties to said telephone conversation disagree as to some of the details discussed, however they do agree that respondent at that time notified appellant that a crew was available to commence digging respondent's potato crop that day; that respondent requested appellant to send bulk trucks to haul the potatoes as soon as possible and that storage in a cellar was discussed. Digging of the potatoes commenced that day and continued until all were harvested.

During the third day following said telephone conversation appellant made available two bulk trucks at respondent's premises and hauled away two truckloads of potatoes aggregating 107,830 lbs. valued at $794.78. The remainder of said crop, amounting to 690,300 lbs. was harvested within the following few days and after inspection and weighing was placed in storage in the Paul E. Jones potato cellar at Gooding, Idaho.

On or about October 28, 1957, respondent went to the office of appellant where he presented the inspection and weight slips relative to the potatoes placed in the Jones cellar and demanded payment. Appellant refused payment contending that delivery of the potatoes had not been made in accordance with the terms of their contract. Thereafter some discussions were had between respondent and appellant's representatives relative to the matter but the parties are in disagreement as to the results of such discussions.

On or about November 22, 1957, respondent sold the stored potatoes to other parties for the sum of $3,092.24. Appellant then commenced this action to recover from respondent the sum of $705.22, said sum being the difference between the value of two truckloads of potatoes received from respondent ($794.78) and the seed potato account ($1,500), plus accrued interest. Respondent answered and filed a counter claim for damages in the sum of $3,029.69 allegedly being the difference between the contract price of the potato crop involved and the market value thereof at the time it was sold, less the $1500.00 seed account owing appellant.

After trial before the court, sitting without a jury, judgment in the amount of $2,969.74 and costs was entered in favor of respondent and against appellant from which judgment this appeal is taken.

The disposition of this case rests largely upon the determination of one question: Does the evidence sustain a finding and conclusion that there was a modification of the original written contract by parol agreement of the parties as to the delivery of the potatoes involved?

■ This Court has followed the general rule of law that parties to an unperformed contract may, by mutual consent, modify it by altering, excising or adding provisions, and such modification may be by parol agreement though the contract is in writing. Smith v. Washburn-Wilson Seed Co., 54 Idaho 659, 34 P.2d 969; Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., 62 Idaho 683, 115 P.2d 401; Inland Empire Refineries v. Jones, 69 Idaho 335, 296 P.2d 519; Brooks v. Beach, 50 Idaho 185, 294 P. 505.

■ Respondent is the party asserting the parol modification of the written contract here involved and has the burden of proving the modification by clear and

convincing evidence. Miller v. Belknap, 75 Idaho 46, 266 P.2d 662; Molyneux v. Twin Falls Canal Co., 54 Idaho 619, 35 P. 2d 651, 94 A.L.R. 1264. In the instant case the parol agreement, which is claimed to have modified the written contract, was entered into during a telephone conversation between respondent and Mr. Holladay, field superintendent of appellant corporation. There were no witnesses to the conversation. The following is an excerpt of respondent's testimony regarding said conversation:

"Q. Will you state to the best of your memory what your conversation was with Mr. Holladay at that time? A. I told him that we had a crew together, our crew available that morning, and we had gone over to dig my neighbor's potatoes and they were a little immature. We were working together on our potatoes, so we decided to come back on to mine if it was all right with Ore-Ida Products, and Mr. Holladay says, 'Do you have your crew altogether?' And I said we had one available, that we could move right over and start, and then he said, 'Well, what are we going to do. We are pretty well tied up down here. What are we going to do with the potatoes?' And I asked if he could send some bulk trucks down, and he said, 'We can't do that today.' Then he said, 'Why don't you start digging and put them in the potato cellar until we can get some trucks down, which will probably be tomorrow.' He said, 'I am pretty sure we can have some bulk trucks down there tomorrow.' And we discussed the inspection and weighing of the potatoes, and he asked if we had any facilities for inspecting those potatoes, and I said, yes, Simplot had a crew in there and the government inspectors were here in town and I figured they could inspect them, and we had them weighed and inspected, and delivered to the cellar.

"Q. Was there any conversation with respect to your loading them on railroad cars? A. None, no. He told me to start digging and they would see me tomorrow with some bulk trucks.

"Q. What did he say with respect to the cellar? A. Well, we discussed that a little. I suggested we put them in Paul Jones' cellar, and he said, 'Is that a good cellar?', or something to that effect, and I said, yes, that was the same place I had put them last year and it was the best cellar in town, I thought, and he said, 'That sounds all right; you haul those potatoes into Mr. Jones' cellar and have them weighed and inspected. When you get all through, you bring what inspection weights you have down and your weigh slips, and we will be down and haul what we can of them, and when we get

through you come down and we will settle up.'

"Q. Is that about the extent of that conversation as you remember? A. Pretty much so, yes.

"Q. What did you do thereafter? A. I went back out to my neighbor's and told him I guessed it was all right if we started digging my potatoes, and so we moved the outfit over to my place and started harvesting the potatoes."

Mr. Holladay testified relative to the telephone conversation as follows:

"Q. And what was the conversation?

"A. Mr. Larsen called and said that he had a crew that was ready to dig his potatoes this particular day; as I recall, he said he had some school students and that it was vacation time and that he must get them out. The season was approaching when it freezes and gets cold in the Gooding area, and we agreed that was the case and that we felt we should make every possible effort to get them out. He wanted us to send some trucks if possible this day or as soon as possible, which I agreed we should do. Then I told Mr. Larsen—he talked to me about putting them in storage in a cellar, and, as usual with our growers, we always try to get the crop safe. We don't like to lose a crop, because it happened the year before with him.

"Mr. Shaw: We object. Let's get this conversation rather than narrative.

"Q. Go on.

"A. We agreed they should be in storage."

Considering each party's explanation of the telephone conversation certainly the trial court was justified in concluding that the parties were in agreement that the potatoes should be harvested as soon as possible and that they should be in storage; that the availability of trucks to haul them was discussed and appellant agreed to send trucks as soon as possible.

Immediately following said telephone conversation respondent proceeded to arrange for the inspection and weighing of the crop by a state inspector. The inspector testified that before making the inspection he talked with appellant's office by telephone for the purpose of obtaining appellant's permission and that "They told me to go ahead and inspect the stuff that was coming in the cellar; that they planned on getting some trucks down and they would haul them in there and would make the inspection there. A couple of days later they showed up with a couple of semi's."

The record also discloses that on the day following the telephone conversation between respondent and Mr. Holladay, appellant's field supervisor, Lloyd Robins, pursu-

ant to respondent's request, ordered 3,000 used burlap bags to be sent to respondent's ranch. Mr. Robins also testified that within a day or two following he went to respondent's premises where he talked with the man operating the digger and he made inspection of the potatoes being harvested. He also testified that he knew the potatoes were being hauled to the cellar.

We think it is important to note that there is no contention on the part of Mr. Holladay that he, on behalf of appellant, during his telephone conversation with respondent, reserved the right to require that the potatoes be delivered aboard railroad cars. Nor was there any evidence introduced from which a conclusion could be drawn that such reservation was made. Although Mr. Holladay testified regarding the substance of said telephone conversation with respondent, he, Mr. Holladay, did not specifically deny respondent's testimony that Mr. Holladay at that time told him "When you get all through, you bring what inspection weights you have down and your weigh slips, and we will be down and haul what we can of them, and when we get through you come down and we will settle up". It is undenied that when the harvest was completed the respondent called at the office of appellant; presented inspection and weight slips; requested settlement which was refused by Mr. Holladay and Mr. Robins upon the ground that respond-ent had not delivered the potatoes aboard railroad cars at Gooding.

■ It is true that one party to a contract cannot alter its terms without the assent of the other and that the minds of the parties must meet as to any proposed modification. The fact of agreement may be implied from a course of conduct in accordance with its existence and assent may be implied from the acts of one party in accordance with the terms of a change proposed by the other. 17 C.J.S. Contracts § 375, p. 860; Smith v. Washburn-Wilson Seed Co., supra. We believe that under the evidence it was convincingly shown that appellant consented to a modification of the contract as contended by respondent.

Appellant's contention that the court made no finding of fact that there was any modification of the written agreement by oral agreement cannot be sustained. Under paragraph V of the findings of fact the court, while referring to the telephone conversation had between respondent and Mr. Holladay on October 15, 1957, found the fact to be that *"At that time it was agreed* that any potatoes not picked up by the plaintiff in its bulk trucks should be stored in the Paul Jones potato cellar at Gooding, Idaho. Plaintiff sent only two bulk trucks to pick up potatoes, and, *pursuant to said oral agreement,* the remainder of the potatoes, not picked up by plaintiff

in its bulk trucks, namely, 690,300 pounds of potatoes, were delivered to the Paul Jones potato cellar." (Emphasis supplied.) Having found that an oral agreement had been entered into the court properly found as a conclusion of law that the original agreement had been "modified by the oral agreement". (Paragraph II—Conclusions of Law.)

Appellant contends that the evidence does not sustain a finding that the appellant refused to accept and pay for the potatoes. To quote the evidence that supports such a finding would unduly extend this opinion, however we have carefully examined the record relative to such contention and find that there is abundant support for such finding.

■ Appellant contends that respondent had no right to resell the potatoes even if there was a delivery and a refusal to accept delivery. We do not agree with such contention. Under the circumstances of this case, respondent's right to resell the property, notwithstanding title had not passed to appellant, and recover damages for any loss sustained because of the breach of the contract (or the sale) is found in the following cited statutes of this State which have been adopted from the Uniform Sales Act. I.C. § 64–311 (being § 51 of the Uniform Sales Act) provides that:

> "When the seller is ready and willing to deliver the goods, and requests the buyer to take delivery, and the buyer does not within a reasonable time after such request take delivery of the goods, he is liable to the seller for any loss occasioned by his neglect or refusal to take delivery, and also for a reasonable charge for the care and custody of the goods. If the neglect or the refusal of the buyer to take delivery amounts to a repudiation or breach of the entire contract, the seller shall have the right against the goods and on the contract hereinafter provided in favor of the seller when the buyer is in default."

An unpaid seller of goods is determined to be such when the whole of the purchase price has not been paid or tendered. See I.C. § 64–401 (being § 52 of the Uniform Sales Act). Under the provisions of I.C. § 64–402 (being § 53 of the Uniform Sales Act) an unpaid seller, whether title has passed to the buyer or not, is given a right of resale as limited by this law (meaning the adopted portion of the Uniform Sales Act). Subd. 2 of said § 64–402 provides:

> "Where the property in goods has not passed to the buyer, the unpaid seller has, in addition to his other remedies, a right of withholding delivery similar to and coextensive with his rights of lien and stoppage in transitu where the property has passed to the buyer."

Appellant argues that the potatoes ceased to be in transit when they were deposited in the Jones cellar and further argues that respondent had no right of stoppage in transitu since there was no evidence of insolvency of the buyer. I.C. § 64–407 (being § 58 of the Uniform Sales Act) provides that goods are in transit:

"a. From the time when they are delivered to a carrier by land or water, or other bailee for the purpose of transmission to the buyer, until the buyer, or his agent in that behalf, takes delivery of them from such carrier or other bailee.

"b. If the goods are rejected by the buyer, and the carrier or other bailee continues in possession of them, even if the seller has refused to receive them back."

In the instant case appellant did not take the potatoes from the bailee (Jones cellar) and the court found from competent and convincing evidence that appellant had refused to accept the potatoes. Respondent testified that after the potatoes had been placed in the cellar appellant's representatives told him "Well, Mr. Larsen, it looks like you better find another buyer for your potatoes." In this respect respondent was corroborated by Paul E. Jones, operator of the cellar, who testified he heard appellant's representatives state that "Mr. Larsen would have to find another buyer." The rejected potatoes remained in the possession of the bailee (Jones cellar) and consequently the right of stoppage in transitu remained in respondent.

I.C. § 64–409 (being § 60 of the Uniform Sales Act) provides:

"Where the goods are of a perishable nature, or where the seller expressly reserves the right of resale in case the buyer should make default, or where the buyer has been in default in the payment of the price an unreasonable time, an unpaid seller having a right of lien or having stopped the goods in transitu may resell the goods. He shall not thereafter be liable to the original buyer upon the contract to sell or the sale or for any profit made by such resale, but may recover from the buyer damages for any loss occasioned by the breach of the contract or the sale.

\* \* \* \* \* \*

"5. The seller is bound to exercise reasonable care and judgment in making a resale, and subject to this requirement may make a resale either by public or private sale."

In the instant case the goods involved were of a perishable nature, in fact there is evidence that the potatoes were spoiling prior to the date of resale by respondent. Following refusal by appellant to accept the potatoes respondent reassumed control and possession of them thereby exercising his

right of stoppage in transitu and also reestablishing his right of lien and right of resale under I.C. § 64–409.

■ The court also found that after appellant refused to accept the potatoes, respondent, exercising due diligence and in good faith in an endeavor to avoid further loss to both parties sold the potatoes for the then market value thereof. No claim was made that the potatoes were not sold at the market price prevailing at the time or that the conduct of the resale was unfair, improvident or in violation of any rule or custom in situations of like character. We think that respondent was within his rights in reselling the property involved. Rocco Perretta & Co. v. Ventrone & Co.; R.I., 117 A. 534; Humphrey v. Sagouspe, 50 Nev. 157, 254 P. 1074. The right of stoppage in transitu may be asserted, not only against insolvent buyer, but also against his ordinary purchasers. Weyerhaeuser Timber Co. v. First Nat. Bank, 150 Or. 172, 38 P.2d 48, 43 P.2d 1078.

■■ Although I.C. § 64–409 is controlling where applicable, it may be stated that it has long been a rule under the general law that where a buyer refuses to accept perishable property under a contract, it is the right of the seller to sell forthwith and in this manner reduce his damages. Tustin Fruit Ass'n v. Earl Fruit Co., 6 Cal.Unrep. Cas. 37, 53 P. 693; Hughes v. Eastern Railway & Lbr. Co., 93 Wash. 558, 161 P. 343;

Barnett v. Williams, Okl., 312 P.2d 443; Magnes v. Sioux City Nursery & Seed Co., 14 Colo.App. 219, 59 P. 879; Growers' Exchange v. John A. Eck Co., 66 Utah 340, 242 P. 391. The trial court also applied the proper measure of damages as provided in I.C. § 64–502, as follows:

"1. Where the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for nonacceptance.

"2. The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract.

"3. Where there is an available market for the goods in question, the measure of damages is, in the absence of special circumstances, showing proximate damage of a greater amount, the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept."

Other assignments of error are that the trial court erred in failing to find that during the meeting of the parties on October 31, 1957, the parties reached an agreement as to the delivery of and the payment for the potatoes. Some evidence was intro-

duced tending to prove such claimed agreement, however, we are convinced, under all circumstances of the case, that the trial court was justified in finding the issues in favor of respondent. The judgment is therefore affirmed. Costs to respondent.

TAYLOR, C. J., and SMITH, McQUADE and McFADDEN, JJ., concur.