497 P.2d 1052

C. H. HISAW, Plaintiff-Appellant,

v.

Harold INGRAM, Defendant-Respondent.

No. 10700.

Supreme Court of Idaho.

June 1, 1972.

T. H. Church, of Church, Church & Snow, Burley, for plaintiff-appellant.

Roger D. Ling, Rupert, for defendant-respondent.

McFADDEN, Justice.

Appellant Craig H. Hisaw instituted an action to recover the down payment he gave as purchaser to the seller, respondent Harold Ingram, on their oral contract for the purchase of 3,000 sacks of "seed potatoes." Respondent counterclaimed alleging appellant had breached the contract by refusing to accept the goods when delivered. After a non-jury trial the district court made findings of fact and conclusions of law favorable to the seller and entered judgment for Ingram in the amount of $3,087.36 plus interest and costs. Hisaw appeals from the judgment and from the order denying his motion to amend the findings of fact and conclusions of law and his motion for new trial.

On April 4, 1967, Hisaw paid $1,500 to Ingram as the down payment on their oral contract whereby Hisaw was to purchase 3,000 sacks of seed potatoes at a price of $2.10 per hundred-weight (cwt.). Delivery was to be later at Ingram's cellar. Before the delivery Ingram gave Hisaw permission to select the potatoes he wanted from the total then piled in the cellar which apparently amounted to some 21,000 sacks.

On May 15, 1967, Hisaw's workmen commenced machine cutting the potatoes for the seed and putting the cuttings into sacks. Hisaw contended that after some sixty sacks had been cut he arrived at the cellar and discovered the potatoes were diseased. He filled a small paper bag with sixty to eighty pieces of seed cuttings, selected at random, and sought out Ingram, advising him that the potatoes were infected with "ring rot." Ingram testified he was not convinced the samples showed ring rot; the two agreed Hisaw should have

the samples tested at the local agricultural experiment station. The tests were made that day and both men were notified that the sample contained bacteria which cause ring rot. Hisaw testified that upon receiving the report he told Ingram he was refusing to accept delivery of the potatoes and that at that time Ingram promised to repay the $1,500 as soon as he could raise the cash.

Ingram's version of the events essentially is in accord except that he denied ever agreeing to repay the $1,500. Rather, he stated that on the first and the subsequent occasions when the two discussed the matter he only told Hisaw he did not have the money. Ingram did admit that he showed the letter he received from the experiment station to a Mr. Guerry with whom he also had a seed potato contract and after Guerry read the letter Ingram allowed him to cancel his order and returned his down payment (half in cash and half in personal labor).

Thereafter Hisaw was able to obtain an alternate supply of seed at a considerably reduced price of 60¢ cwt. Within a few weeks Ingram sold the 3,000 sacks of potatoes to others also at a reduced price. During the next eighteen months Hisaw repeatedly asked for return of the $1,500 with no results.

The court found there had been no mutual rescission, and, as the original contract had been admitted, gave judgment to Ingram for the contract price less the down payment and sums received on sale of the 3,000 sacks to third parties. Appellant Hisaw assigns as error the failure of the district court to conclude as a matter of law that there was a mutual rescission manifested by Ingram's words and actions and that the sum awarded as damages to Ingram was incorrectly determined.

■ The first issue is whether Ingram's actions indicate he assented or acquiesced to the buyer's repudiation and, if so, that because Ingram regained possession of the potatoes, Hisaw is entitled to a restitution-ary remedy and thus recover the $1,500. In such a situation assent or acquiescence to the repudiation (labeled mutual rescission) may be determined from the acts of the parties. Jensen v. Chandler, 77 Idaho 303, 291 P.2d 1116 (1955); American Silver Min. Co. v. Coeur D'Alene Mines Corp., 94 Idaho 54, 480 P.2d 900 (1971); Restatement, Contracts, § 406.

■ The Jensen v. Chandler decision, besides setting out the above rule, held that on appeal the factual determinations of the trial judge would be accorded all inferences favorable to the findings, a rule applicable here. Thus, in the instant case Ingram's actions after learning of the repudiation were equivocal. The parties differ completely as to what Ingram said upon being told of the apparent diseased condition of his potatoes; Ingram denied he told his buyer he would return the $1,500. The two do agree that Ingram repeatedly deferred repaying the money by indicating a cash shortage. The cancellation of the Guerry contract and return of the down payment, however, do not square with the fact several other sales of potatoes as "seed potatoes" were thereafter completed despite those other buyers being aware of the alleged diseased condition of the potatoes.

■ Although certain of Ingram's actions might be viewed as assent to the repudiation, as a whole we agree with the district court there is substantial doubt. The record indicates a lack of a distinct understanding. Ingram apparently did not consider the existence of disease in the samples proof that his entire harvest stored in the cellar was infected. One may wonder why Ingram never asked Hisaw to pay the loss and waited to assert his claim until sued by the buyer; that question was not asked at the trial. We agree, then, with the district court that on balance Hisaw's theory of mutual rescission or abandonment was not sufficiently supported by his proof as was his burden. The district court finding against appellant on his complaint was sustained by the evidence.

No issue of express or implied warranty has been raised in this appeal. Indeed, the district court found that the potatoes were not diseased, a finding not challenged in this Court. The remaining issue concerns the award of damages on the counterclaim.

The record shows that after Hisaw repudiated the contract Ingram had on hand at least 5,562 sacks of potatoes, of which 3,000 were to have been delivered to Hisaw. On the next point the record is unclear; the parties argued that sometime soon after the repudiation Ingram sold loads of seed potatoes to Gompert and Shuman[1] totaling 2,800 sacks. (Although there is a statement that the sales were arranged prior to May 15, based on arguments by counsel for both sides, we will assume these were new transactions after May 15.) The price on these sales was $1.85 cwt. Besides these sales, Ingram sold 2,509.60 sacks as processor grade potatoes, half at 45¢ cwt., and half at 40¢ cwt., and 152.80 sacks at 35¢ cwt. Ingram claimed all these latter sales were of seed quality potatoes. Additionally, he stated he used 150 sacks for his own planting needs.

The district court computed damages by taking as the resale basis the 2,662.40 sacks sold at the low prices and only 337.60 sacks at the $1.85 rate. Among other things, appellant insists damages should be based on the sales of 2,800 sacks at $1.85 and only 200 sacks at 45¢ cwt.

■ In that the only evidence in the record indicates that the potatoes were "of a perishable nature" the rights of the parties are governed by I.C. § 64–409.[2] Under that provision, Ingram, the unpaid seller, was entitled to sell the 3,000 sacks to the best paying buyer. That is, the measure of damages under that statute is the difference between the contract price and the price on resale. Ore-Ida Potato Prod., Inc. v. Larsen, 83 Idaho 290, 362 P.2d 384 (1961). The question on this record is which of the postrepudiation sales should be considered in fixing damages under I.C. § 64–409, *supra*.

■ Under the facts presented here, those sales made by Ingram after the date of breach which he could have made notwithstanding the breach are not to be used as offsetting sales. Restatement, Contracts § 336(1), Comment C; Corbin on Contracts, § 1039, pp. 246–7 (1964). The method employed to determine damages ought to place Ingram in as good a position as he would have been in had Hisaw in fact performed. 22 Am.Jur.2d Damages, § 47. *And see* O. A. Olin Co. v. Lambach, 35 Idaho 767, 209 P. 277 (1922). On this record it appears that with or without the repudiation by Hisaw, Ingram had remaining a substantially sufficient supply of seed potatoes to have filled the sales of 2,800 sacks at $1.85 cwt. We conclude, therefore, that Ingram is entitled to have the full advantage of those sales which he could make to the extent of his excess seed potato supply. The method employed by the district court to compute damages correctly followed this method.

Hisaw has questioned the actual quantity of Ingram's excess supply of seed potatoes over the 3,000 sacks covered by their contract. He contends that amount of seed potatoes remaining in Ingram's inventory as a result of the Guerry sale cancellation should be subtracted from the 2,800 sacks

1. The record also indicates a sale at this time to one Jones. The price and amount are not apparent from the record.

2. I.C. § 64–409, since repealed by the U.C.C., reads: "Resale by seller—When and how may be made.—1. Where the goods are of a perishable nature, or where the seller expressly reserves the right of resale in case the buyer should make default, or where the buyer has been in default in the payment of the price an unreasonable time, an unpaid seller having a right of lien * * * may resell the goods. He shall not thereafter be liable to the original buyer upon the contract to sell or the sale or for any profit made by such resale, but may recover from the buyer damages for any loss occasioned by the breach of the contract or the sale. * * * 5. The seller is bound to exercise reasonable care and judgment in making a resale, and subject to this requirement may make a resale either by public or private sale."

sold to Gompert and Shuman. He argues that Ingram acted inconsistently with his duty to mitigate damages by cancelling his contract with Guerry and thereby increasing his supply of seed after May 15. This contention assumes part or all of the potatoes sold to Gompert and Shuman were originally to go to Guerry. The record does not indicate the quantity involved in the Guerry contract nor do we know the terms of that agreement. The record indicates this sale was cancelled just prior to Hisaw's repudiation. And there is nothing to indicate Ingram's actions were wrongful or unjustified. Considering the reason for cancellation was the evidently unwarranted report stating the potatoes were diseased, we conclude Ingram's actions were not inconsistent with his duty to mitigate damages.

Hisaw next contends that damages were not proved with the required degree of definiteness in that Ingram did not show the potatoes sold after the date of breach were all "seed" potatoes, and that Ingram failed to exercise reasonable care in obtaining an adequate price on the resale of the 3,000 sacks.

■ Appellant's contention that Ingram did not show the potatoes in his cellar after the date of breach were all seed potatoes is not persuasive in light of the favorable view of the record we must take on appeal. Ingram testified the potatoes he had available had been "topped" or had been roughly sorted to remove the large potatoes unfit for seed. He further stated all the quantities referred to herein were of seed quality. There is also evidence that Ingram's "seed" customers were satisfied with their purchases. This contention, then, has no merit.

■ As to whether Ingram took reasonable care in reselling the potatoes, the record reflects that the market price for seed potatoes fell over the months from the time of the parties' agreement until the time of repudiation. Hisaw himself testified he found a supply after May 15 for only 60¢ cwt. Additionally, a witness fa-

miliar with the potato market in the area at that time testified seed potato supplies that year were ample after May 15. It seemed that seed contracts were entered into well before the planting season and that after May 15 Ingram was caught in a poor market for new sellers. He testified he tried to sell the extra several thousand sacks for seed but found no buyers.

The judgment for respondent and the order denying the motions for amendments of findings of fact and new trial are affirmed. Costs to respondent.

McQUADE, C. J., DONALDSON and SHEPARD, JJ., and MAYNARD, District Judge, concur.