# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 49354

M. FRANK SULLIVAN, an individual; THE
SULLIVAN LIMITED PARTNERSHIP, an
Idaho limited partnership; and THE GREEN
DESERT, LLC, an Idaho limited liability
company,

    Plaintiffs-Appellants,

v.

BITTERSWEET RANCH, LLC, an Idaho
limited liability company,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2023 Term

Opinion Filed: September 15, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Jefferson County. Stevan H. Thompson, District Judge.

The order of the district court is <u>affirmed</u>.

Swafford Law, PC, Idaho Falls, for Appellants, M. Frank Sullivan, The Sullivan Limited Partnership, and The Green Desert, LLC. Ronald L. Swafford argued.

Holden, Kidwell, Hahn & Crapo, PLLC, Idaho Falls, for Respondent, BitterSweet Ranch, LLC. D. Andrew Rawlings argued.

---

STEGNER, Justice.

Between 2015 and 2019, BitterSweet Ranch and its managers ("BitterSweet") leased three parcels of farmland from Frank Sullivan and two of his business entities, The Green Desert, LLC, and The Sullivan Limited Partnership[1] (this individual and the two entities will be collectively referred to as "Sullivan" unless otherwise indicated). The parties signed three identical five-year leases ("the Leases") involving three separate parcels of real property, each owned by one of the three Sullivan parties. The Leases specified that Sullivan was to be responsible for payment of the

---

[1] The notice of appeal denotes that Sullivan Limited Partnership is a limited liability company; however, the Idaho Secretary of State's Office states that the entity was created as an Idaho Limited Partnership. Accordingly, we have corrected the designation for The Sullivan Limited Partnership.

property taxes, but that those parties were to be reimbursed by BitterSweet, and that BitterSweet was to be responsible for bi-annual rent payments, utilities, and water assessments.

For a variety of reasons, including a purported effort to minimize Frank Sullivan's income for tax purposes as well as to help BitterSweet cover unexpected expenses that had arisen as a result of farming Sullivan's real property, the parties purportedly orally agreed to modify the Leases to offset amounts owed to each other throughout the terms of the Leases. At the end of each year, the parties would "true up all of the amounts . . . to make the final rent payments a complete settling of matters between lessor and lessee for each year." Shortly before the Leases were set to expire at the end of their five-year terms, Sullivan claimed that BitterSweet was in breach of the Leases for its alleged failure to make timely rent payments, to pay all property taxes, and to pay the water assessments pursuant to the terms of the Leases.

Sullivan then filed three lawsuits (one for each of the Leases and in the names of each of the three parties) in district court. The district court ordered the cases consolidated and then granted summary judgment in favor of BitterSweet, concluding that a genuine issue of material fact had not been created as to whether BitterSweet had breached the Leases. Sullivan appeals the adverse order. For the reasons discussed below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Daren Bitter, Kent Bitter, and other members of the Bitter family[2] own and operate BitterSweet Ranch in eastern Idaho. In 2014, BitterSweet began communicating with Frank Sullivan seeking to lease farmland owned and controlled by Frank Sullivan and his businesses, The Sullivan Limited Partnership and The Green Desert, LLC. BitterSweet and Sullivan ultimately entered into three leases—one for both of the Sullivan entities and Frank Sullivan himself. The Leases became operative on February 21, 2015, and ran through December 31, 2019, with an option to negotiate an extension or additional agreement.

The Leases specified that half of the annual rent would be due on March 15 and the other half would be due on September 15 each year. The Leases further provided that BitterSweet would be responsible for necessary maintenance on the properties up to $1,500 per calendar year. The Leases also stated that BitterSweet would be responsible for all water assessments and property

---

[2] Because Daren, Kent, and other family members and managers of BitterSweet share the same surname, Bitter, these parties' first names are used to differentiate between them and for ease of reference. No disrespect is intended by doing so.

taxes due on each of the three leased parcels. Despite these written terms in the Leases, the parties purportedly made several subsequent oral modifications, giving rise to this litigation.

In late 2015, the water assessment costs for ground water users increased "drastically" after the Idaho Ground Water Appropriators, Inc., and the Surface Water Coalition reached a settlement agreement in their years-long litigation. As a result of the settlement, water assessments for the leased properties were expected to increase annually from roughly $3 per acre to $20 per acre. The assessments ultimately increased between $11 and $15 per acre. Also in late 2015, the hay market "was depressed, resulting in significantly low hay prices (approximately $65 per ton, rather than about $200 per ton the year before)[.]" BitterSweet suffered additional losses that year when it was forced to spend tens of thousands of dollars on bait to deal with a mouse infestation on all three of the leased parcels.

In anticipation of its upcoming rental obligations, BitterSweet arranged a meeting with Frank Sullivan to discuss the losses caused by "unexpected costs and the poor hay prices." BitterSweet's representatives (Daren, Kent, and "the other managers of BitterSweet Ranch") explained BitterSweet's dilemma to Frank Sullivan, and he "asked what [they] wanted from him and the other [l]andlords." BitterSweet's representatives "told [Frank] Sullivan that [they] felt that property owners typically pay for water assessments because they are related to the landlord's ownership of water rights and real property, rather than a lessee's operations on the farm, and that therefore the [l]andlords should pay the water assessments."

Daren explained in his affidavit that Frank Sullivan had informed him "that he (and his entities) would 'take care of the water assessments' and pay them despite what the written terms of the Leases said[,]" and that Sullivan would also pay the property taxes for the three leased parcels. As an apparent result of this conversation, Sullivan paid the water assessments for each year during the terms of the Leases. However, Sullivan and BitterSweet regularly swapped responsibility for the property taxes, depending on each party's financial condition at the end of the year, with Sullivan paying property taxes in 2015, 2016, and 2017 and BitterSweet paying property taxes for 2018 and 2019.

In addition to the oral modifications regarding water assessments and property taxes, the parties also discussed changing the term in the Leases regarding maintenance costs. Daren stated in his declaration that "[a]t the time of the signing of the Leases, [Frank] Sullivan and I orally agreed that BitterSweet Ranch would pay $1,500 of expenses *per* incident, as that was the

3

arrangement that I had with other landlords." (Italics added.) However, the Leases stated something different:

> Lessee [BitterSweet] shall also be responsible, unless otherwise provided in this Lease, for all services, maintenance, repairs to and replacement, if necessary, of the irrigation, drainage and pumping items and equipment or appurtenances thereto *up to the first $1,500 of calendar year annual repairs*, provided the necessary repairs are not caused by Lessee's or Lessee's agents', employees' or contractors' negligence, in which case the entire cost of the repair shall be the responsibility of the Lessee.

(Italics added.) Daren further explained that "[Frank] Sullivan . . . requested numerous times during the term of the Leases that BitterSweet Ranch cover farm-related expenses in excess of $1,500 per incident." When incidents arose, Frank Sullivan orally agreed that the rent owed by BitterSweet would be reduced by the amount spent on "farm-related expenditures" in excess of the $1,500 per incident limit. Daren recounted in his declaration:

> [Frank] Sullivan told me that Landlords [Sullivan and his two other entities] wanted to reduce BitterSweet Ranch's rent in lieu of paying for the expenses himself because doing so would reduce his income now (like an expense in the current year) rather than having to depreciate the costs of those expenses over multiple years, if he incurred them.

Due to several unexpected, yet necessary, "farm-related expenditures" every year, BitterSweet was often left without the funds to pay the full rent at the end of the year. However, BitterSweet regularly contacted Frank Sullivan to give him status updates of the various repairs "and to explain that BitterSweet Ranch could pay him or wait until the repairs were finished. . . . In all of these conversations, both in person and over the telephone, [Frank] Sullivan always instructed me [Daren] to complete the repairs and then send him a check."

As a result of these repairs and varying water adjustments and property taxes, Sullivan and BitterSweet would "true up all of the amounts we owed each other to make the final rent payments a complete settling of matters between lessor and lessee for each year." For example, at the end of 2015, apparently as a result of the conversation with BitterSweet detailing its financial troubles for the year, BitterSweet sent the December rent checks for the Green Desert and Sullivan Limited Partnership leases "at [Frank] Sullivan's verbal direction[.]" However, BitterSweet withheld the rent owed for Frank Sullivan's Lease because Frank Sullivan had said, according to Kent, that Frank Sullivan "wanted to delay recognizing that revenue until tax year 2016." BitterSweet followed this direction and sent the Frank Sullivan Lease rental payment in January 2016. At the same time, BitterSweet sent additional money to Sullivan "as reimbursement for the property taxes

Sullivan had paid in December 2015[.]" The parties had several email and in-person conversations regarding the necessary off-sets to the total rent. Daren stated in his affidavit that "[Frank] Sullivan never indicated or told me that he would seek a reimbursement for any expenses he paid, for the offset rent amounts, or for water assessments or taxes paid by Landlords."

In 2019, Sullivan and BitterSweet began negotiating a renewal of the Leases. During one of the conversations regarding the terms for the new leases, Frank Sullivan and BitterSweet orally "agreed that the new leases would stipulate that Landlords would be responsible for paying the water assessments to reflect our oral agreement in this regard and our course of conduct since 2015." During that conversation, Frank Sullivan asserted that BitterSweet had benefitted greatly as a result of Sullivan covering the water assessments. BitterSweet agreed and "thanked him [Frank Sullivan] for keeping his word to pay them." Frank Sullivan did not reply to the thanks but said instead "that he would begin working on the new leases." The parties continued to informally negotiate new lease terms.

In late 2019, four days before the expiration of the Leases, BitterSweet received a letter from Frank Sullivan on behalf of himself and his business entities that "requested that BitterSweet Ranch reimburse him for all of the water assessments that he had paid since 2015 in addition to past due rent, late penalties, taxes, and various other charges." Several days later, in January 2020, Daren responded on behalf of BitterSweet, explaining that he had understood his and Frank Sullivan's oral communications as well as Frank Sullivan's subsequent conduct to mean that Frank Sullivan had agreed to pay for the water assessments and had not expected BitterSweet to reimburse him.

Sullivan then filed three lawsuits (one for each of the Leases) in district court in September 2020. The complaints were amended in November 2020, alleging that BitterSweet had breached the terms of the Leases when it purportedly failed to make timely rent payments, to pay all property taxes, and to pay the water assessments. Shortly thereafter, the district court ordered the three cases consolidated. BitterSweet moved for summary judgment, arguing that there was not a genuine issue of material fact as to whether BitterSweet had breached the Leases because they had been orally modified. The district court agreed and granted summary judgment in BitterSweet's favor. The district court then dismissed Sullivan's claims. The district court also awarded costs and attorney fees to BitterSweet. This appeal followed.

5

## II. STANDARDS OF REVIEW

> When reviewing an order for summary judgment, the standard of review for this Court is the same standard used by the district court in ruling on the motion. The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The burden of establishing the absence of a genuine issue of material fact rests at all times with the party moving for summary judgment. On review, this Court liberally construes the record in the light most favorable to the party opposing the motion, drawing all reasonable inferences and conclusions in that party's favor. If there is no genuine issue of material fact, only a question of law remains, over which this Court exercises free review.

*Davison v. Debest Plumbing, Inc.*, 163 Idaho 571, 574–75, 416 P.3d 943, 946–47 (2018) (internal citations and quotation marks omitted).

"An award of attorney fees and costs is within the discretion of the trial court and subject to an abuse of discretion standard of review." *Dickinson Frozen Foods, Inc. v. J.R. Simplot Co.*, 164 Idaho 669, 676, 434 P.3d 1275, 1282 (2019) (internal quotation marks and citations omitted). The inquiry for an abuse of discretion asks "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Id.* (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 864, 421 P.3d 187, 194 (2018)) (alteration in original).

## III. ANALYSIS

### A. The district court did not err in granting summary judgment to BitterSweet.

The district court granted BitterSweet's motion for summary judgment solely on the basis that there was not a genuine issue of material fact as to whether the parties had orally modified the terms of the Leases. The district court ruled that BitterSweet had provided sufficient, unrebutted evidence to support its theory of oral modification. The district court further ruled that, even construing the facts most favorably to the non-moving parties, Sullivan had failed to demonstrate a genuine issue of material fact regarding the actions of the parties. The only submission countering BitterSweet's evidence was an affidavit in which Frank Sullivan denied that various conversations between him, Daren, and Kent had taken place. Though Frank Sullivan had denied the *conversations*, he provided no evidence to dispute the *conduct* or the written communications of the parties, which the district court concluded were sufficient to demonstrate that a modification

6

to the Leases had occurred, that the parties had agreed to the oral modification, and that summary judgment was appropriate.

On appeal, Sullivan argues that BitterSweet's evidence was insufficient to support the district court's determination that the conduct and the oral agreement of the parties was not disputed. Instead, Frank Sullivan argues that he acted in reliance on the terms of the Leases, not on any oral communications that may have occurred. Sullivan appears to argue that the only way to alter the terms of the Leases is by written agreement, not conduct or oral agreement. Because Frank Sullivan denies that the conversations took place, the terms of the Leases continue to control, or, at the very least, Frank Sullivan's affidavit established that genuine issues of material fact remain for trial. Sullivan also asserts that BitterSweet must prove oral modification by clear and convincing evidence as set out in *Scott v. Castle*, 104 Idaho 719, 662 P.2d 1163 (Ct. App. 1983), and the district court erred when it concluded that the actions of the parties constituted clear and convincing evidence of an oral modification. Finally, Frank Sullivan argues that even though he accepted late payments, in contravention of the Leases, he gave notice to BitterSweet each time that he was continuing to rely on the terms of the Leases.

BitterSweet responds that Sullivan has not provided any evidence disputing the *actions* of the parties, which are sufficient at the summary judgment stage to demonstrate that an oral modification occurred. BitterSweet argues that the numerous conversations and annual "true-ups" that occurred over the terms of the Leases where the parties agreed to modify certain terms, such as payment of water assessments and adjustment of rental amounts, evidence a ratification of the modifications. As a result, the district court's reliance on this conduct, as well as the text and email corroboration, was a proper basis for concluding that the parties had modified the terms of the Leases and subsequently granting summary judgment for BitterSweet.

We agree with BitterSweet and hold that the district court did not err when it concluded there was no genuine issue of material fact as to whether the parties had orally modified the terms of the Leases. The "truing up" of the parties' various debits and credits on an annual basis during the five-year term of the Leases belies Sullivan's argument. Moreover, Frank Sullivan's statement that each time he accepted a late payment from BitterSweet he gave notice to BitterSweet that he was continuing to rely on the specific terms of the Leases is simply not borne out in this record. In fact, Frank Sullivan stated the opposite in his affidavit: "It is agreed by the plaintiffs that we [Sullivan and BitterSweet] did not discuss any oral agreement *or discuss payment of the required*

7

*payments pursuant to the terms of the three (3) leases*." (Italics added.) Further, in his brief on appeal Frank Sullivan again contradicted the assertion that he gave notice to BitterSweet when he wrote that "[Frank] Sullivan did accept late payments without simultaneously requesting the interest owed as a late penalty." Frank Sullivan's affidavit simply does not support the argument now being made that he regularly told representatives of BitterSweet that he intended to rely on the written terms of the Leases.

> While proof of an oral modification by clear and convincing evidence is the appropriate burden of proof at the trial of a matter, at the summary judgment stage the function of the trial court is not to weigh the evidence or to try the factual issues by whatever standard is appropriate to the case, but merely to determine whether or not there exists any genuine issue of material fact as adduced from the entire record.

*Kline v. Clinton*, 103 Idaho 116, 121, 645 P.2d 350, 355 (1982) (internal citations omitted). Accordingly, the question before this Court is if there exists a genuine issue of material fact as to whether the parties intended to orally modify their written agreements. We conclude that there is no genuine issue of material fact on this issue.

The leading case in Idaho regarding oral modifications of written agreements is *Ore-Ida Potato Products, Inc. v. Larsen*, 83 Idaho 290, 362 P.2d 384 (1961). There, Ore-Ida sold Larsen seed potatoes for $1,500, and the parties entered into a contract that required Larsen to "plant, cultivate[,] and harvest Russet potatoes on 25 acres of his farm near Gooding[.]" *Id.* at 292, 362 P.2d at 384. The contract provided that the potatoes produced from Ore-Ida's seed potatoes would be delivered to Ore-Ida via railroad cars. *Id.* at 292, 362 P.2d at 384–85. Despite this written provision, the parties apparently had a conversation on the telephone that, due to the unavailability of the harvest crew at the requested time, the potatoes would need to be stored in a cellar, then transferred to trucks sent by Ore-Ida. *Id.* at 292, 362 P.2d at 385. The harvest continued, and Ore-Ida sent and hauled away two truckloads of potatoes. *Id.* at 293, 362 P.2d at 385. The remainder of the crop was put into a potato cellar, at which point Larsen "presented [to Ore-Ida] the inspection and weight slips relative to the potatoes placed in the . . . cellar and demanded payment." *Id.* Ore-Ida refused to pay for the stored potatoes because Larsen "had not delivered the potatoes aboard railroad cars at Gooding[,]" pursuant to the terms of the contract. *Id.* at 293, 296, 362 P.2d at 384, 387.

On appeal, the primary question was whether the oral conversations between the parties had modified the terms of their written agreement. *Id.* at 293, 362 P.2d at 385. Larsen argued that Ore-Ida had told him to put a portion of the potato crop into storage, a modification to which they

8

both had agreed, and Ore-Ida's subsequent refusal to pay for the potatoes in the cellar amounted to a breach of the orally modified contract. *Id.* at 293–94, 362 P.2d at 385–86.

This Court held that these discussions were sufficient to show that Ore-Ida had "consented to a modification of the contract" because Ore-Ida had done what it said it would do during its conversations with Larsen. *Id.* at 296–97, 362 P.2d at 387–88. This action confirmed "that the original agreement had been modified by the oral agreement" because it demonstrated that there had been a meeting of the minds regarding the proposed modification. *Id.* at 297, 362 P.2d at 388 (internal quotation marks omitted); *see also id.* at 296, 362 P.2d at 387 (citing 17 C.J.S. *Contracts* § 375, p. 860).

Here, the actions of both BitterSweet and Sullivan confirm that a meeting of the minds occurred regarding the oral modifications of the Leases. In *Ore-Ida*, this Court concluded that the contract had been modified because the parties acted in accordance with their proposed modifications. Here, Frank Sullivan has not provided any evidence to contradict the facts that he acted in accord with the modifications as set out by BitterSweet in its declarations, text messages, and emails. Further, Sullivan does not deny the conversations in the text messages and emails, nor the allegations that his subsequent acts were done in conformity with the details of the texts and emails. He simply says the in-person conversations alleged by BitterSweet never occurred (which is specifically contradicted by the texts and emails exchanged). In addition, he has no explanation for the fact that the parties engaged in an annual reconciliation of their respective debits and credits.

As in *Ore-Ida*, presenting proof of statements modifying the terms of a contract, coupled with action in accordance with those statements, may be sufficient to support a meeting of the minds that the written agreements have been modified. As noted by the district court, Sullivan has not provided any evidence to dispute the facts presented by BitterSweet. As a result, the district court appropriately concluded that "the presence of merely disputed conversations does not preclude summary judgment in light of the undisputed actions of the parties."

Indeed, Frank Sullivan does not dispute BitterSweet's characterization of the course of conduct of the parties and instead seems to confirm this depiction in his declaration where he states: "Plaintiffs agree that the texts speak for themselves. These texts do not prove anything other than an accounting of offsets between the plaintiffs and defendant." However, the "truing up" of accounts on an annual basis puts this case in the category of actions speaking louder than words. Sullivan appears to now contend that these regular accountings should be disregarded because of

9

Frank Sullivan's subjective belief that, even though the regular accountings were taking place, they seemingly have no bearing on whether summary judgment should be granted. Simply submitting an affidavit denying the legal effect of earlier financial reconciliations between the parties does not create a genuine issue of material fact necessitating a trial. More is required of a litigant who seeks to oppose a motion for summary judgment. *Kootenai County v. Harriman-Sayler*, 154 Idaho 13, 17, 293 P.3d 637, 641 (2012) ("[C]onclusory assertions unsupported by specific facts are insufficient to raise a genuine issue of material fact precluding summary judgment." (internal citations and quotation marks omitted)).

The district court supported its determination with details regarding each alleged violation. First, the district court noted that Frank Sullivan regularly accepted and even occasionally requested that rental payments be deferred without any indication that he would charge a late fee. Frank Sullivan's own affidavit is contradictory. In one paragraph, Frank Sullivan stated that "Plaintiffs [Sullivan] absolutely deny ever telling Daren Bitter that I wanted the defendant [BitterSweet] to wait until 2016 to make the 2015 required payments pursuant to the three (3) leases." However, he later stated within the same paragraph, "that he may have told the defendant to go ahead and pay his 2015 second payment after January 1, 2016[.]"

Next, the district court concluded that, despite the Leases requiring Sullivan to pay property taxes and then seek reimbursement from BitterSweet, Sullivan only sought reimbursement for two of the five years, apparently as a result of the conversations Frank Sullivan had with BitterSweet regarding financial hardships during the other three years. Finally, regarding the reimbursement for water assessments, the district court determined that, although "the contract required BitterSweet to pay them directly[,]" Sullivan paid the water assessments "and is now seeking reimbursement under Paragraph 24 of the Leases." However, Paragraph 24 required Sullivan to give reasonable notice to BitterSweet, which the district court concluded had never occurred. The district court determined that "[Frank] Sullivan's actions in paying the water assessments routinely with no advance notice of any kind about seeking repayment, as required by the Lease, to Bitter[S]weet can only show that he was acting [in] accordance with the modification to pay the water assessments himself."

In sum, the district court explained:

It is undisputed that Sullivan accepted late payments of rent without mentioning any intent to charge interest as a late penalty, agreed to and regularly discussed the offsetting of rent amounts based on Bitter[S]weet's payment of various farm

expenses without mention of the other fees that Sullivan now claims are owed, paying the property taxes without requesting reimbursement for years, and paying the water assessments without notice despite the Lease[s] requiring notice.

We conclude that the district court reasonably determined from the alleged conversations between BitterSweet and Sullivan and the undisputed actions of Sullivan that a meeting of the minds had occurred, as necessary to ratify an oral modification. Additionally, Sullivan has not presented more than a scintilla of evidence to suggest that a genuine issue of material fact exists regarding whether the parties orally modified the Leases.

We finally note that, although the Leases contained an anti-waiver provision, the district court did not analyze whether waiver was an applicable consideration in determining whether to grant summary judgment. At oral argument, Sullivan argued the Leases' anti-waiver provision should have precluded summary judgment. However, Sullivan only argued the applicability of the waiver provision in his reply brief. This Court "looks only to the initial brief on appeal for the issues presented because those are the arguments and authority to which the respondent has an opportunity to respond in the respondent's brief." *Suitts v. Nix*, 141 Idaho 706, 708, 117 P.3d 120, 122 (2005). Accordingly, we need not address the anti-waiver provision in the Leases.

In sum, the district court did not err in granting summary judgment in BitterSweet's favor. Because we conclude that the district court did not err in granting summary judgment on the theory of oral modification, we need not reach BitterSweet's other arguments.

**B.      The district court did not err in awarding attorney's fees and costs to BitterSweet.**

Before the district court, BitterSweet requested attorney's fees pursuant to Idaho Code sections 12-121 and 12-120(3) as well as section 34.2 of the Leases. The district court determined that BitterSweet was the prevailing party because it "avoided liability on all claims." On appeal, Sullivan argues exclusively that, because the district court erroneously granted summary judgment to BitterSweet, the subsequent award of attorney's fees should be vacated. In light of our conclusion that the district court correctly granted summary judgment to BitterSweet, Sullivan's opposition to the district court's award of attorney's fees to BitterSweet is baseless. We affirm the district court's award of attorney's fees to BitterSweet pursuant to section 34.2 of the Leases, which clearly requires the defaulting party to "pay to the other party all costs and expenses, including, but not limited to, reasonable attorney fees[.]"

11

**C.** **BitterSweet is entitled to attorney's fees and costs on appeal. We decline to award attorney's fees or costs to Sullivan.**

Both parties request attorney's fees on appeal pursuant to Idaho Code sections 12-121 and 12-120(3), and section 34.2 of the Leases. Frank Sullivan, the Green Desert, LLC, and the Sullivan Limited Partnership are not the prevailing parties, thus, they are not entitled to an award of attorney's fees on appeal. However, having successfully defended the district court's grant of summary judgment in its favor, BitterSweet is the prevailing party on appeal, and we turn to its request for attorney's fees.

Each of the three Leases contains a provision enumerated, section 34.2, which states:

ENFORCEMENT. Should either party default in the performance of any covenants or agreements contained herein, such defaulting party shall pay to other party all costs and expenses, including, but not limited to, reasonable attorney fees, including such fees on appeal, which the offended party may incur in enforcing this Lease Agreement or in pursuing any remedy allowed by law for breach hereof, whether such breach is incurred by the filling [sic] of suit or otherwise.

(Capitalization in original.)

For the reasons described above, Frank Sullivan and the entities he controls are clearly the defaulting parties. BitterSweet was forced to defend this lawsuit to enforce the provisions of the Leases, as orally modified. Accordingly, it is entitled to an award of attorney's fees on appeal pursuant to section 34.2 of the Leases.

Because we award attorney's fees to BitterSweet under section 34.2 of the Leases, we need not analyze whether BitterSweet is also entitled to attorney's fees pursuant to Idaho Code sections 12-121 or 12-120(3).

## IV. CONCLUSION

The district court did not err in granting summary judgment to BitterSweet. There was no genuine issue of material fact that the parties had orally modified the Leases. Therefore, BitterSweet was entitled to judgment as a matter of law. Similarly, the district court did not err in awarding attorney's fees to BitterSweet pursuant to section 34.2 of the Leases. Because BitterSweet prevailed in its appeal, we also award attorney's fees to it based on section 34.2 of the Leases. BitterSweet is also awarded its costs on appeal as a matter of right. I.A.R. 40.

Chief Justice BEVAN and Justices BRODY, MOELLER and ZAHN CONCUR.