713 P.2d 442

**Harold S. VOGT and Betty J. Vogt, husband and wife, Plaintiffs-Respondents,**

v.

**Bob MADDEN and Neva Madden, husband and wife, Defendants-Appellants.**

No. 15346.

Court of Appeals of Idaho.

Sept. 20, 1985.

Rehearing Denied Jan. 21, 1986.

Petition for Review Denied April 15, 1986.

David E. Kerrick of Alexanderson, Davis, Rainey, Whitney & Kerrick, Caldwell, for defendants-appellants.

William J. Brauner (argued) and Byron K. Meredith, Caldwell, for plaintiffs-respondents.

WALTERS, Chief Judge.

Harold and Betty Vogt sued Bob and Neva Madden for damages allegedly resulting from the Maddens' breach, as landlords, of a sharecrop agreement. A jury returned a verdict in favor of the Vogts. The Maddens appeal from the judgment entered on the verdict, presenting three issues. They contend first that the evidence was insufficient to support the jury's implicit finding that a sharecrop agreement existed between the parties for the year 1981. Next, the Maddens argue that the amount of damages found by the jury was based on speculation. Finally, they assert that the Vogts failed to mitigate their alleged damages. We agree with the Maddens that it was not proven that a contract existed between the parties for the year 1981. We reverse the judgment in regard to that issue. We affirm, however, that portion of the judgment awarding damages to the Vogts for the years 1979 and 1980.

It was undisputed that Harold Vogt had an oral sharecrop agreement with Bob Madden to farm seventy acres of land owned by the Maddens, for the year 1979. It also was undisputed that the parties renewed the agreement for the year 1980. Under their agreement, certain expenses would be borne solely by Vogt, other expenses would be shared equally between Vogt and Madden, and the net profits derived from crops grown on the land would be divided equally between them. When

the Vogts eventually filed suit contending a sharecrop agreement existed for the year 1981, Vogt also sought recovery from Madden of $2,000 for the Maddens' share of expenses incurred by Vogt in the years 1979 and 1980.

The dispositive issue in this appeal is whether Vogt and Madden had a sharecrop agreement that Vogt could continue to farm the seventy acres, during 1981. Vogt testified that because no profits had been realized from wheat crops grown on the property in 1979 and 1980, he planned to raise beans on the land in 1981. He testified that he met with Madden several times in August and September, after the wheat crop had been harvested in 1980, concerning the expenses remaining for the years 1979 and 1980. He testified:

> [W]e also discussed the 1981 crop, of what to do then. We had several discussions on this. I met with him two or three, four times—I'm not sure how many—and we both agreed it wasn't the best ground. It isn't number one soil out there, because of the steepness, but I had raised grain for two years, and I had left the straw and stubble on the ground. And I had raised a—let the volunteer grain grow, watered it and plowed it under the first year. And I anticipated plowing under the second year and at that point I told him I thought it would raise a fairly decent crop of pinto beans.
>
> .    .    .    .    .
>
> And at that time I told Bob [Madden] that I'd raised two years of grain, plowed under this straw and stubble, and I thought it would raise a crop of pinto beans. And at that time I had decided to do that. I was going to raise the pinto beans on there, along with possibly a few acres of garden beans.
>
> Q: And as a result of that conversation, it was your understanding that you were to farm that; is that correct?
>
> A: Yes.
>
> .    .    .    .    .
>
> Q: And when you were discussing the fact of growing the bean crop with Mr.

Madden, did he have any objection to that type of crop being grown on his ground?

> A: No, not at all.

On cross-examination, Vogt testified as follows:

> Q: You talked about beans, then?
>
> A: Yes, sir.
>
> Q: But Mr. Madden never told you that he wanted to grow beans, did he?
>
> A: No.
>
> Q: He never expressly told you that he would enter into another agreement in the spring of '81?
>
> A: Yes. What we done, we just—I told him I had raised this crop, the wheat and grain for two years, and the third year we could raise a crop of pintos, a crop of beans. And the price of beans at that time was good, and as far as I know that was the way the discussion ended.
>
> Q: But Mr. Madden never agreed one way or another, right?
>
> A: I would say I was under the impression that we had an agreement.
>
> Q: But he never said anything to give you that indication?
>
> A: Honestly, I don't think he said, "Yes, go ahead." No, he didn't say that.

Madden disputed that he and Vogt had agreed to a sharecrop arrangement for the year 1981. He testified that, following one of their discussions over the expense bills for 1979 and 1980,

> And I said at that time, I told him, I said, "I just had it. I don't want you to farm it any more. I'll send you what I think is right."
>
> .    .    .    .    .
>
> "Harold," I said, "Life's too short to argue over these things, let's just—we're through."

In respect to that same discussion, Vogt denied on rebuttal that Madden had made any statement about Vogt not farming the Maddens' land the next year. In the late fall of 1980, Madden leased the property to another party for the 1981 crop year, thus preventing Vogt from pursuing his plan to

raise beans on the land. This lawsuit for damages followed.

By its verdict in favor of Vogt for $18,540, the jury concluded that a sharecrop agreement existed between Vogt and Madden for the year 1981.[1] In order to reach such a conclusion the jury must have disbelieved Madden when he testified he informed Vogt that their relationship was "through," and that he, Madden, did not want Vogt to farm the property any longer. Otherwise, had the jury believed Madden, then clearly the parties would not have had a contract for 1981. If Madden were disbelieved, then the only evidence regarding the creation of a contract between Vogt and Madden for the year 1981 would be Vogt's testimony that he informed Madden of his intent to raise beans on the property in 1981, that Madden did not say "yes" to this proposal, but that Vogt nonetheless was left with the "impression" that a contract had been created.

The question whether silence or inaction may constitute acceptance of an offer was an issue in this case. Over Madden's objection, the jury was given an instruction, No. 18, concerning silence as an acceptance of an offer, creating a contract between the offeror, Vogt, and the offeree, Madden. The instruction was requested by Vogt, demonstrating that Vogt was pursuing a theory that the evidence showed the creation of a sharecrop agreement for 1981 arising because of silence on Madden's part.

The instruction stated:

Silence and inaction may constitute acceptance of an offer to contract, where a party is under a duty to speak or to reject the offer. Such a duty may arise under any one of the following circumstances.

1. Where because of previous dealings it is reasonable that the offeree should notify the offeror if the offeree does not intend to accept.

2. Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to believe the offeror thought the offer was accepted.

3. Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

This instruction was a slightly modified version of the RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981).[2] The RESTATEMENT explains that silence by an offeree ordinarily does not operate as an acceptance of an offer. "The exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance." *Id.* comment *a*, at 165.

Here, two of the exceptions stated in § 69, and in the court's instruction No. 18, are patently inapplicable because they are wholly unsupported by the evidence. There was no evidence that Madden received "the benefit of offered services" for which Vogt expected to be compensated. *See, id.* comment *b*, at 165 ("when the

---

1. Vogt testified that, had he been allowed to farm the Maddens' property in 1981 under the same sharecrop arrangement as in 1979 and 1980, he would have realized a net profit of $16,540. That figure, when added to the $2,000 owed by Madden to Vogt for the 1979–80 expenses, totals $18,540, the amount of the verdict.

2. In relevant part, RESTATEMENT (SECOND) OF CONTRACTS § 69, at 165 provides:

(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:

(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.

(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer.

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

recipient knows or has reason to know that services are being rendered with an expectation of compensation, and by a word could prevent the mistake, his privilege of inaction gives way; under Subsection (1)(a) he is held to an acceptance if he fails to speak.''). Vogt did not, in fact, farm the property in 1981. Nor does the evidence show that Vogt stated or gave Madden reason to understand that assent to Vogt's expectation to farm the property might be manifested by silence or inaction, and the evidence does not show that Madden, by remaining silent and inactive intended to accept Vogt's offer. *Id.* § 69(1)(b).

Finally, the exception arising from "previous dealings" between the parties is inapposite. In their prior dealings, 1979 and 1980, the parties expressly reached oral agreements for sharecropping the farm. After completion of the contract for 1979, a new contract for 1980 did not automatically follow. It was preceded by discussions between Vogt and Madden resulting in an express understanding that Vogt could farm the property in 1980 on a sharecrop basis. We do not believe those previous transactions could give rise to a legitimate conclusion that Vogt's offer to farm the property in 1981 would be accepted in the absence of affirmative notification from Madden that the offer would not be accepted. To the contrary, the previous dealings always resulted in· a contract only when both parties expressly agreed.

 Absent the applicability of the exceptions stated in RESTATEMENT § 69, it is a general rule of law that silence and inaction, or mere silence or failure to reject an offer when it is made, does not constitute an acceptance of the offer. *See generally* 17 AM.JUR.2d, CONTRACTS § 47, at 385–86 (1964); J. CALAMARI and J. PERILLO, THE LAW OF CONTRACTS § 2–21, at 63–68 (1977). Because none of the exceptions is applicable in this case, we conclude as a matter of law that no contract to sharecrop the Maddens' property in 1981 was created by Madden's silence in response to Vogt's offer to farm the property. We therefore set aside that portion of the judg-

ment awarding damages to the Vogts based on the alleged 1981 contract. We deem it unnecessary to discuss whether those damages were based on speculation or whether mitigation of damages was proved.

On appeal the Maddens do not question the award by the jury to the Vogts of $2,000 representing reimbursement of expenses for the years 1979 and 1980. We therefore affirm that portion of the judgment.

The judgment is reversed in respect to award of any damages for breach of the alleged 1981 contract. The case is remanded for entry of a modified judgment allowing recovery to the Vogts for $2,000 with interest at the rate provided by I.C. § 28–22–104(2) from the date of the original judgment. Costs to appellants, Madden. No attorney fees on appeal.

SWANSTROM, J., concurs.

BURNETT, J., voted to grant the petition for rehearing.