839 P.2d 1192

**HECLA MINING COMPANY and Bunker Limited Partnership, Plaintiff–Respondents,**

v.

**STAR–MORNING MINING COMPANY, Defendant–Appellant.**

No. 19019.

Supreme Court of Idaho, Boise, April 1992 Term.

Aug. 31, 1992.

W.W. Nixon, Coeur d'Alene, and Layman, Loft, Arpin & White, Spokane, Wash., for appellant, Star–Morning Min. Co. John R. Layman argued, Spokane, Wash.

Evans, Keane, Koontz, Boyd, Simco & Ripley, Kellogg, for respondent, Hecla Min. Co.; Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for respondent, Bunker Ltd. Partnership. Fred M. Gibler, Kellogg, argued.

JOHNSON, Justice.

This is a contract case in which the trial court granted partial summary judgment. We first address whether the trial court properly certified the partial summary judgment as a final judgment pursuant to I.R.C.P. 54(b). We conclude that the certification was proper. The primary issue presented is whether the admissible evidence submitted in opposition to the motion for summary judgment was sufficient to raise genuine issues of material fact concerning the defenses of waiver and equitable estoppel. We conclude the evidence was not sufficient. Therefore, we affirm the summary judgment and remand this case to the trial court for further proceedings on the remaining claims.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

Hecla Mining Company (Hecla) and Bunker Limited Partnership (Bunker) each owned an undivided interest in the Star–Morning Mine (the mine). (Hecla and Bunker will be referred to as Hecla unless otherwise indicated). In 1984, Star–Morning Mining Company (Star) entered lease and rental agreements (the 1984 lease) with Hecla to lease the mine. In 1985, the parties amended the 1984 lease to provide that Hecla could terminate the lease by written notice if operations were suspended for twelve consecutive months.

Star began operating the mine, but was unable to meet the lease payments. The mine was shut down in the fall of 1985. The parties negotiated to continue operations. During August 1987, Hecla sent a proposed modified lease (the 1987 draft) to Star. On September 16, 1988, Hecla notified Star that the 1984 lease was terminated. Star signed the 1987 draft in December 1988. Hecla then declined Star's request to sign the 1987 draft.

Hecla filed this lawsuit in 1989, seeking: (1) declaratory judgment that the 1984 lease was terminated, (2) $527,841.80 in past-due lease payments, (3) declaratory judgment that the 1987 draft was not in effect, (4) quiet title against Star's claims, and (5) damages resulting from the loss of the sale of the mine.

Star asserted the parties had modified the 1984 lease with the 1987 draft. Among other things, the 1987 draft rescheduled the lease payments Star owed Hecla under the 1984 lease. Star also asserted that Hecla's statements and conduct caused Star justifiably to rely on the 1987 draft to its detriment. Star contended that Hecla's statements and conduct constituted waiver of Hecla's right to timely lease payments under the 1984 lease and estopped Hecla from denying the effectiveness of the 1987

draft. Star counterclaimed seeking: (1) a declaratory judgment that the 1987 draft was in effect, (2) $20,000 for Hecla's wrongful termination of the 1984 lease, and (3) $550,000 damages because of Hecla's failure to produce a buyer for Star's ore as was required by the parties' marketing agreement.

Hecla moved for partial summary judgment seeking declaratory judgment that the 1984 lease was properly terminated and the 1987 draft was not in effect.

Star submitted an affidavit by Jay Layman, Star's operations manager, opposing Hecla's motion for summary judgment. During oral argument on the summary judgment motion, Hecla's attorney objected "to some of the evidence asserted [in the affidavit of Jay Layman] on the grounds that it's conclusory and no foundation." Hecla's attorney then gave an example and asked the court to consider carefully the Jay Layman affidavit because it contained some incompetent evidence.

The trial court granted partial summary judgment to Hecla, stating that affidavits submitted by the parties were conclusory and lacked the specificity required by I.R.C.P. 56(e). On the basis of facts the trial court said were undisputed, the trial court decided: (1) Hecla properly terminated the 1984 lease, (2) Hecla did not accept the terms of the 1987 draft, and (3) Star had no leasehold interest in the mine. Star moved for an I.R.C.P. 54(b) certification that the partial judgment was final, which the court granted.

## II.

### THE I.R.C.P. 54(b) CERTIFICATION WAS PROPER.

█ Although the parties did not present on appeal the issue of whether the trial court properly certified the partial judgment as final under I.R.C.P. 54(b), the Court questioned the propriety of the certification at oral argument. Because this is a jurisdictional question, we first must resolve our concerns about the certification.

I.R.C.P. 54(b) states, in part:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court may direct the entry of a final judgment upon one or more but less than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of the judgment.

We recently addressed the applicability of an I.R.C.P. 54(b) certification in *Thorn Creek Cattle Ass'n v. Bonz*, 122 Idaho 42, 830 P.2d 1180 (1992). In *Thorn Creek*, the Court held that in a foreclosure action, the liability and deficiency were aspects of the same claim and that an I.R.C.P. 54(b) certification was improper. *Id.* at 45, 830 P.2d at 1183.

This case is distinguishable from *Thorn Creek*. The claim for past-due lease payments is separate from Hecla's claims that Star did not have a leasehold interest in the mine based on either the 1984 lease or the 1987 draft. Star owed the delinquent lease payments to Hecla, regardless of whether the 1984 lease had been terminated. Although the 1987 draft rescheduled the payment of the delinquent lease payments, the liability for the delinquent payments arose out of the 1984 lease, not the 1987 draft. As to Hecla's quiet title claim, the declaration that Star did not have a leasehold interest in the mine, in effect, quieted title against Star as to any interest in the mine.

Hecla also requested damages due to the loss of a sale of the mine. If this were merely a request for damages as a coincident part of the declaration of the termination of the 1984 lease and the ineffectiveness of the 1987 draft, an award would have been within the jurisdiction of the trial court. *Sweeney v. American Nat'l Bank*, 62 Idaho 544, 550–51, 115 P.2d 109, 111 (1941). In that event, we would have concluded that there had not been a full adjudication of the declaratory judgment claims, and we would have concluded that the certification of final judgment pursuant to I.R.C.P. 54(b) was improper.

In the complaint, however, Hecla alleged that in December 1988, when Star signed and returned the 1987 draft, Hecla intended to sell the mine to a purchaser. Hecla alleged that the purchaser had plans to commence mining operations at the mine, but that the purchaser was not able to obtain financing, which was a condition of the sale, "because of the claims by [Star] to an interest in the [mine]."

This request for damages was apparently based on a slander of title claim. *See Matheson v. Harris*, 98 Idaho 758, 760, 572 P.2d 861, 863 (1977). There is further evidence in the record that the damages requested were based on slander of title. A letter from Star's secretary and treasurer to Bunker dated January 5, 1989, which is attached to the affidavit of Hecla's secretary in support of the motion for summary judgment, states:

Hecla Mining Co. has advised us it does not wish to continue as a lessor of the Star Morning Mine and mill because it hopes to sell its interest in the Mine to your group. As we have advised Hecla we believe we retain rights as a lessee and our position is that any sale of all or a portion of the mine would be subject to our rights as lessee. We have no objection to the sale of Hecla's interest in the property to you so long as our rights are respected.

Because it appears that the request for damages was based on a separate slander of title claim, and not as damages incident to the declaratory judgment, we conclude that this was a separate claim. Therefore, we conclude that the certification of final judgment pursuant to I.R.C.P. 54(b) was proper.

### III.

THE AFFIDAVIT OF JAY LAYMAN IN OPPOSITION TO HECLA'S SUMMARY JUDGMENT MOTION DID NOT RAISE GENUINE ISSUES OF MATERIAL FACT CONCERNING WAIVER OR EQUITABLE ESTOPPEL.

■ Star asserts that the trial court should not have granted summary judgment because the affidavit of Jay Layman and documents submitted by Star in opposition to Hecla's motion contain admissible evidence that raise genuine issues of material fact concerning: (1) whether Hecla waived its right to rely on the 1984 lease, and (2) whether Hecla is equitably estopped from terminating the 1984 lease. We disagree with Star's assertions.

In *Crouch v. Bischoff*, 78 Idaho 364, 304 P.2d 646 (1956), the Court defined waiver:

A waiver is the intentional relinquishment of a known right. It is a voluntary act and implies election by a party to dispense with something of value or to forego some right or advantage which [the party] might at [the party's] option have demanded and insisted upon.

*Id.* at 368, 304 P.2d at 649 (citations omitted).

■ A party asserting waiver must have acted in reliance upon the waiver and altered the party's position. *Brand S Corp. v. King*, 102 Idaho 731, 734, 639 P.2d 429, 432 (1981).

■ Waiver is an equitable doctrine based upon fairness and justice. The existence of waiver ordinarily is a question of fact and is foremost a question of intent. In order to establish waiver the intention to waive must clearly appear, although it may be established by conduct. *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 518, 520, 650 P.2d 657, 660, 662 (1982).

■ Equitable estoppel arises when a party makes a false representation or concealment of a material fact with actual or constructive knowledge of the truth; it is made with the intent that it be relied upon; the party asserting estoppel does not know or could not discover the truth; and the party asserting estoppel relies on it to the party's prejudice. *Twin Falls Clinic & Hosp. Bldg. Corp. v. Hamill*, 103 Idaho 19, 22, 644 P.2d 341, 344 (1982).

■ Star first argues that the trial court should not have refused to consider portions of Jay Layman's affidavit without a motion to strike by Hecla. There is no authority in this state that requires a mo-

tion to strike or an objection before a trial court may exclude or not consider evidence offered by a party. Absent plain or fundamental error, some form of objection is ordinarily necessary, however, to preserve the right to challenge on appeal the admission or consideration of evidence. I.R.E. 103(a)(1) (Error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected and a timely objection or motion to strike appears of record, stating the specific ground of objection.)

I.R.C.P. 56(e) states:

**Rule 56(e). Form of Affidavits— Further testimony—Defense required.**—Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [the party's] pleadings, but [the party's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the adverse party] does not so respond, summary judgment, if appropriate, shall be entered against [the party].

In this case, Hecla objected to the consideration of some of the evidence presented in Jay Layman's affidavit. At the hearing on the motion for summary judgment, Hecla's attorney told the trial court:

We don't dispute the facts set forth in [Star's] affidavits so far as the facts asserted represent competent evidence. And we object, however, to some of the evidence asserted on the grounds that it's conclusory and no foundation. An example is in a couple of places in the affidavit there is a declaration that we agreed, referring to, apparently [Star] and [Hecla and Bunker], we agreed to something. And there's no evidence of when the agreement was made, what it was, who was present, and who said what to whom. Otherwise, essentially, we see this case as an application of law to the facts. Really we haven't quibbled, we haven't filed [any] counter affidavits quibbling with their factual assertions nor have they with ours.

. . . .

If the court please. One point on the matter of facts is we simply would urge the court to consider carefully the affidavit of Jay Layman for the reason that I just mentioned, that I think there is some incompetent evidence there and also because if you compare the facts set forth in their key affidavit with their brief, we contend they do not jibe. That is, assertions are made in the brief that are not backed up by the affidavit. But the court will—that will be evident to the court when you study that.

In *Evans v. Twin Falls County,* 118 Idaho 210, 796 P.2d 87 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 960, 112 L.Ed.2d 1048 (1991), the Court applied I.R.C.P. 56(e) in upholding the trial court's rejection of an affidavit submitted in opposition to a motion for summary judgment by the defendants in a wrongful death case. The affidavit was by a surviving husband, who was not a physician, stating his belief that his wife's death was proximately caused by the actions of the defendants. The trial court rejected the affidavit as " 'inadmissible evidence,' because it was 'not valid medical testimony.' " *Id.* at 212, 796 P.2d at 89.

In affirming the trial court's rejection of the affidavit in *Evans,* the Court said:

Under Rule 56(e) of the Idaho Rules of Civil Procedure, the affidavits supporting and opposing summary judgment "shall be made on personal knowledge, and shall set forth such facts as would be admissible in evidence...." The district court held that [the husband's] affidavit

containing his lay opinion that the events on April 15, 1987, caused [his wife's] death eleven months later was not admissible evidence.

Under the Idaho Rules of Evidence Rules 701 and 702, and the decisions of this Court, the trial court has discretion in determining whether to allow a lay witness to express an opinion relating to causation.

. . . .

We conclude that the trial court did not err in concluding that the lay opinion of [the husband] that his wife's death by cardiac arrest was caused by the events of April 15, 1987, was not admissible under I.R.E. 701 and the prior decisions of this Court and the Court of Appeals. Accordingly, if there was a wrongful death claim pled, the trial court did not err in dismissing it.

*Id.* at 213–14, 796 P.2d at 90–91.

■■■■■ The fact that the evidence presented in support of or in opposition to motions for summary judgment must be admissible evidence, does not affect the rule that the trial court, and this Court on review, should liberally construe the facts in the record in favor of the nonmoving party and draw all reasonable inferences from the record in favor of the nonmoving party. *Hoene v. Barnes,* 121 Idaho 752, 756, 828 P.2d 315, 319 (1992); *Pearson v. Parsons,* 114 Idaho 334, 338, 757 P.2d 197, 201 (1988); *Doe v. Durtschi,* 110 Idaho 466, 469–70, 716 P.2d 1238, 1241–42 (1986). The question of admissibility is a threshold question to be answered before applying the liberal construction and reasonable inferences rule to the admissible evidence.

In this case, the trial court said in its opinion granting Hecla's motion for summary judgment:

The affidavits of William J. Grismer and Frank J. Breidt submitted by Hecla in support of its motion and the affidavit of Jay S. Layman submitted by [Star] in opposition to Hecla's motion are generalized, conclusory, and lack the specificity required by IRCP 56(e). The affidavits do not reflect when a conversation took place, who was present, nor who said what.

At the best, the Breidt affidavit indicates that he individually did not make any statement to [Star] or its agents that the July 19, 1984 Lease Agreement would not be terminated. Grismer makes the same statement and additionally indicates in his position as Secretary of Hecla that Art Brown was the person, "who was responsible at Hecla for making any final agreement." Grismer additionally states "I did not intend that any modification be made whatsoever without the consent and approval of Bunker Limited."

Jay S. Layman's affidavit contains few direct statements, instead it relies upon the uninformative and conclusory use of phrases such as "we participated in negotiations with the plaintiffs ..."; "Hecla represented ..."; "[Star] immediately communicated orally to plaintiffs ..."; "We agreed ..."; "All parties were aware ..."; "based upon representations by representatives of plaintiff that ..."; and "Hecla indicated ..." None of these statements provide the kind of specific, admissible facts which will either support or prevent the entry of summary judgment.

The trial court then concluded that, in effect, Hecla and Star had presented the motion based upon the documents, specific facts recited by the trial court in the introduction to its opinion, and four "specific, undisputed, material facts." The specific facts recited by the trial court in the introduction to its opinion were taken virtually verbatim from Hecla's brief in support of its motion for summary judgment. The one additional fact stated by the trial court in the introduction to its opinion was that in the fall of 1986, Star performed some ditching and changed the water flow in the mine. This fact appears to have been taken from Jay Layman's affidavit.

The following four additional "specific, undisputed, material facts" were recited by the trial court:

1. Jay Layman had numerous meetings with representatives of Hecla re-

garding Environmental Protection Act problems.

2. In the summer of 1988, Hank Walde of Hecla specifically informed Jay Layman that there had been no discussion or involvement with Bunker concerning entering into a lease or operating the mine. Based on Walde's representations, Star entered into settlement negotiations with Acme Trading, a creditor.

3. Jay Layman told Frank Breidt at Bunker of each of his conversations with someone in the marketplace.

4. Frank Breidt represented to Jay Layman that by combining the concentrates of Bunker and Star they would have more marketing power.

Essentially, Star does not dispute the facts recited by the trial court in its opinion. Star contends that in addition to these facts the trial court should have considered the contents of Jay Layman's affidavit and other documents submitted to the trial court in determining whether there were genuine issues of material fact.

Star contends that Jay Layman's affidavit establishes:

1. There were numerous agreements between Star, which included Jay Layman, and Hecla regarding problems with the 1984 lease and the development of the 1987 draft.

2. There were continuing agreements between Star and Hecla regarding sale of concentrates and possible markets for the concentrates.

Star also contends that Jay Layman's affidavit and other documents submitted to the trial court establish that Hecla represented that Hecla did not intend to deny Star the right to proceed with operating the mine.

Star's waiver theory is that Hecla's action, silence, and inaction operated as acceptance of the 1987 draft and waived Hecla's right to rely on the 1984 lease. Star argues that Hecla drafted the 1987 draft and initiated a course of conduct demonstrating that the parties had agreed to the new lease terms. Star contends that whether Hecla was silent as to the 1987 draft after submitting it to Star is a question of material fact that needs to be determined by the trial court.

Alternatively, Star asserts that Hecla is equitably estopped from terminating the 1984 lease. Star argues that Hecla's denial to Jay Layman of any dealings with Bunker regarding leasing the mine to Bunker was clearly a false representation upon which Star relied and about which Star could not discover the truth. Star contends that from Hecla's actions it is clear Hecla intended that Star rely on Hecla's denial of dealing with Bunker regarding the mine. Star states that it did rely to its detriment and changed its position particularly with regard to its entering settlement negotiations with its creditors.

We find much of the contents of Jay Layman's affidavit to be properly characterized as this Court characterized the evidence offered in opposition to a motion for summary judgment in *Gardner v. Evans*, 110 Idaho 925, 930, 719 P.2d 1185, 1190, *cert. denied*, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986).

> I.R.C.P. 56(e) requires that "supporting and opposing affidavits shall be made on personal knowledge, *shall set forth facts as would be admissible in evidence*, and shall show affirmatively that *the affiant is competent to testify* to the matters stated therein." (Emphasis added.) The matters referred to by Gardner, and upon which the plaintiffs rely, do not satisfy either the requirement of admissibility or competency under Rule 56(e). Most are opinions or conclusions of Gardner, which are ... inadmissible."

We note that in *Gardner* neither the Court's opinion nor the record indicates that there was objection to the trial court's consideration of the matters to which Gardner referred. As we have indicated above, some form of objection in the trial court is necessary to preserve the right to challenge on appeal the admission or consideration of evidence, unless the error is plain or fundamental. To this extent, we now restrict our review of the admissibility of evidence under I.R.C.P. 56(e) more strictly than *Gardner* did.

The affidavit of Jay Layman describes in general terms the course of negotiations between Star and Hecla from October 1985 through August 1987. Although some of the statements made in the affidavit concerning these negotiations are not supported by a foundation that would establish their admissibility, we conclude that this is not consequential. Mere negotiations for a new lease do not establish that Hecla waived its right to rely on the 1984 lease.

More critical are the following assertions by Jay Layman in his affidavit:

1. Hecla represented to Star that it had authority to lease the mine because Bunker was in default in its agreement with Hecla concerning the mine.

2. When Star received a letter from Hecla's general counsel dated August 25, 1987, forwarding the 1987 draft and stating that he would "like to finalize [the draft] such that all parties will be prepared to sign them once the Cominco strike is settled," Star immediately communicated orally to Hecla that Star accepted the terms and agreed that the draft would be signed upon obtaining a marketing agreement.

3. Hecla and Star agreed that the 1987 draft contained all the terms and was the new lease existing between the parties.

4. It was Star's understanding with Hecla that Star and Hecla would sign the 1987 draft, and start production and shipping to Cominco, as soon as the Cominco strike was terminated.

5. In the first week of September 1988, Star entered into litigation with creditors, based upon representations by representatives of Hecla that Star would be able to commence production in the near future. Approximately $40,000 was spent in participation in this litigation. This expense would not have occurred had Hecla indicated there were problems with Hecla recognizing Star's lease.

6. From September through November 1988, Star continued discussions with Cominco and Hecla about market possibilities. Cominco finally offered a contract. Star received a contract for shipment in December 1988 for both lead and zinc.

7. Pursuant to Star's understanding with Hecla, Star signed the 1987 draft and sent a copy of the shipping agreement to Hecla.

8. Hecla improperly seized equipment of Star located at the mine. This equipment remained at the mine site as a result of an understanding that Star was to reopen the mine upon obtaining a contract from Cominco.

We agree with the trial court that these statements are conclusory and do not provide the kind of specific, admissible facts that will either support or prevent the entry of summary judgment. As the Court said in *Gardner*, these statements "do not satisfy either the requirement of admissibility or competency under Rule 56(e)." 110 Idaho at 930, 719 P.2d at 1190.

Excluding the inadmissible assertions contained in Jay Layman's affidavit, there are no genuine issues of material fact concerning Hecla's alleged waiver of its right to rely on the 1984 lease. The 1987 draft states that all parties must sign before it is effective, and it is undisputed that Hecla did not sign. In addition, most of the actions that Star argues it took in reliance on the draft were taken before Hecla submitted the 1987 draft to Star. Star's decisions to maintain the mine and to meet government regulations during the negotiation period do not show reliance because these actions were appropriate under the existing 1984 lease.

Likewise, there are no genuine issues of material fact concerning Hecla being equitably estopped from terminating the 1984 lease. There is no evidence to support Star's argument that Hecla was dealing with Bunker regarding leasing the mine to Bunker. The only evidence is that Hecla may have been considering selling its interest in the mine to Bunker. In that event, whatever leasehold interest Star had in the mine would not have been affected. Also, without the inadmissible assertions in

the affidavit of Jay Layman there is no evidence of Star's reliance on any allegedly false representation by Hecla.

## IV.

## CONCLUSION.

We affirm the summary judgment and remand the case to the trial court for further proceedings.

We award costs on appeal to respondents.

BAKES, C.J., McDEVITT, J., and TROUT, J., Pro Tem. concur.

BISTLINE, Justice, dissenting.

In its memorandum decision, the district court provides a recitation of the history of the case, and then beginning on the bottom of page four, recognizes the rules relative to summary judgment, citing a plethora of cases—all of which serves no purpose other than to tell lawyers what they already know relative to summary judgment proceedings.

The supposed heart of the opinion, captioned "Discussion," naturally should go to the heart of the controversy. The first paragraph thereof finds fault in the affidavits of Hecla, and even-handedly finds that Star–Morning is guilty of the same fault. The theme of the district court is best exemplified by two disjointed sentences, being the last sentence of the first paragraph in the discussion, and the second being the final sentence at the bottom of the same page: "The affidavits [submitted by both parties] do not reflect when a conversation took place, who was present, nor who said what.... None of these statements provide the kind of specific, admissible facts which will either support or prevent the entry of summary judgment." R. at 117. Taken together, they serve to explain, but not justify, the district court's reason for branding the affidavits "generalized, conclusory, and lacking in specificity" as to Star–Morning Mining Company's alleged leasehold interest in the Star–Morning Mine.

Accepting the district court's foregoing assessment at face value, *at that point* any reasonable reader would wonder how it came about that the district court nevertheless was able to move on and reach the conclusion that, "Hecla is entitled to partial summary judgment on the issue of the existence of any enforceable leasehold interest held by Star–Morning Mining Company in the Star–Morning Mine." Despite the court's remonstrances and expressed dissatisfaction with the affidavits of both parties, it is readily apparent that neither the plaintiff nor the defendant corporate entities were troubled by the language which each used in its affidavit, denigrated by the court as conclusory, *i.e.*, "We agreed," "all parties were aware," "Hecla represented...."

In writing the opinion for this Court, Justice Johnson, at 781, 839 P.2d at 1195 (1992), states only that:

> During oral argument on the summary judgment motion, Hecla's attorney objected 'to some of the evidence asserted [in the affidavit of Jay Layman] on the grounds that it's conclusory and no foundation.' Hecla's attorney then gave an example and asked the court to consider carefully the Jay Layman affidavit because it contained some incompetent evidence.

The really interested reader will become better informed as to the district court's regard for *all* of the affidavits, including the Jay Layman affidavit by taking note of the district court's written decision wherein is stated:

> The affidavits of William J. Grismer and Frank J. Breidt submitted by Hecla in support of its motion and the affidavit of Jay S. Layman submitted by SMMC in opposition to Hecla's motion are generalized, conclusory, and lack the specificity required by IRCP 56(e). The affidavits do not reflect when a conversation took place, who was present, nor who said what.
>
> At the best, the Breidt affidavit indicates that he individually did not make any statement to SMMC or its agents that the July 19, 1984 Lease Agreement

would not be terminated. Grismer makes the same statement and additionally indicates in his position as Secretary of Hecla that Art Brown was the person, 'who was responsible at Hecla for making any final agreement.' Grismer additionally states 'I did not intend that any modification be made whatsoever without the consent and approval of Bunker Limited.'

Jay S. Layman's affidavit contains few direct statements, instead it relies upon the uninformative and conclusory use of phrases such as 'we participated in negotiations with the plaintiffs ...,'; 'Hecla represented ...'; 'SMMC immediately communicated orally to plaintiffs ...'; 'We agreed ...'; 'All parties were aware ...'; 'based upon representations by representatives of plaintiff that ...'; and 'Hecla indicated....' None of these statements provide the kind of specific, admissible facts which will either support or prevent the entry of summary judgment.

R. 117.

At that point in its written decision, the district court thoroughly discounted the showings which the parties, respectively Hecla Mining Company and Bunker Hill Limited Partnership, plaintiffs-respondents, and Star–Morning Mining Co., defendant-appellant, had made per their affidavits, as is well-documented by the court's assessment of the controversy:

In effect the parties[1] have presented this motion based upon the specific facts stated above and the following specific, undisputed, material facts [which the district court apparently pieced together by

perusing the record before it, there being no transcript of testimony][2]:

1. Jay S. Layman had numerous meetings with Colleen Kelley, Ron Kahlor, and Hank Walde, from Hecla regarding the EPA problems.

2. In the summer of 1988, Hank Walde of Hecla specifically informed Jay S. Layman that there had been no discussions or involvement with Bunker Limited concerning entering into a lease or operating the Star Morning Mine. Based upon his representations, SMMC entered into settlement negotiations with Acme Trading.

3. Jay S. Layman told Frank Breidt at Bunker Hill of each of his conversations with someone in the marketplace.

4. Frank Breidt represented to Jay S. Layman that by combining our concentrates we would have more marketing power.

R. 118.

The district judge, having laid out his own perception of the undisputed facts, presented the litigating parties with the conclusions reached:

I conclude that the July 19, 1984 Lease Agreement was properly and timely terminated by Hecla on September 16, 1988. That the July 19, 1984 Lease Agreement had not been abandoned by August 25, 1987 is established by the language included in the August 24, 1987 Draft Lease Agreement which provides for the cancellation of the July 19, 1984 Lease Agreement.

There is no dispute concerning SMMC's suspension of active mining for a period of twelve consecutive months nor SMMC failure to mine and concentrate at least

---

1. The only motion presented was that of the co-plaintiffs. Star–Morning did *not* move for summary judgment. It had filed a counterclaim seeking monetary damages, and that claim for relief was not dealt with by the district court.

2. If ever there be controversies which should *not* have been disposed of without a trial, this is a prime example. The trial court, as noted initially in the first paragraph, did recite established principles relative to summary judgment motions and procedures. Specifically mentioned was the rule that the non-moving party is entitled to the benefit of the trial court's liberal

construction of all the facts and inferences contained in pleadings, depositions, and admissions, and likewise, supporting affidavits, in the light most favorable to it, the non-moving party.

If the district court applied that rule in this case, surely it would necessarily have surfaced in the "Discussion" section of the opinion, in the form of a weighing process which would reveal the court's application of that principle, disclosing where it took the court. It may be that I am remiss in my reading, but that weighing process is certainly not obvious to me.

15,000 tons of ore during any period of twelve consecutive months.

R. 118.

As to the extent to which those conclusions were properly drawn by the district court, that is probably determinable in the eyes of the beholder. Obviously, Justice Johnson in authoring the opinion for the Court sees no problem. Apparently the other members of the Court are untroubled. The difficulty which I experience stems in part from recollection of the Court's recent disposition of *Haessly v. Safeco Title*, 121 Idaho 463, 825 P.2d 1119 (1992). There, on rehearing the Court withdrew its earlier opinion in favor of Haesslys and issued a second opinion which vacated the grant of summary judgment to the Haesslys, based on this Court's observation that the district court went astray in granting the summary judgment "without giving recognition to, and discussion of, the second of Safeco's two theories of defense ..." 121 Idaho at 466, 825 P.2d at 1122.

Understanding that to be a precedential ruling, an even-handed administration of justice requires that this Court do likewise in this case. To that end, appended hereto are the trial brief and exhibits (Appendix A) which the lesser corporate entity, Star–Morning Mining Company provided to the district court. Any open-minded reader who peruses that brief should readily be brought to the conclusion that this was not a proper case for summary disposition on Hecla's motion for summary judgment. Beyond any doubt, the district court should have become more fully acquainted with the case than was possible under the then presented circumstances.

One of these circumstances is found in the attachments to the brief, clearly demonstrating in Hecla's own words that "economic recess" had been a problem besetting both Hecla and Star–Morning. Strangely enough, Article 23 in the previous 1984 Lease Agreement recognized "force majeure" as a viable excuse for lessened performance. In short, one member of this Court is, for certain, not at all convinced that this Court is not just reviewing the rulings of the district court, but may be seen as providing some of the reasoning for upholding the decision, which reasoning was solely within the province of the district court.

Accordingly, I regret my inability to join the Court's opinion, and dissent therefrom.

### APPENDIX A

John R. Layman

Layman, Loft, Arpin & White

P.O. Box 1907

Spokane, WA 99210–1097

Phone: (509) 455–8883

William W. Nixon

P.O. Box 1560

Coeur d'Alene, ID 83814–1560

Phone: (208) 667–4655

Attorneys for Star Morning Mining Company

In the District Court of the First Judicial District of the State of Idaho, in and for the County of Shoshone

Hecla Mining Company and Bunker Limited Partnership, plaintiffs,

v.

Star Morning Mining Company, defendant.

No. 28208

### DEFENDANT'S BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

#### I. INTRODUCTION

Defendant respectfully requests that the court deny plaintiffs' motion for partial summary judgment because genuine issues of material fact exist as to:

a) Whether the parties had modified the original lease agreement and had agreed to the terms of a new lease as set forth in the lease accompanying Mike White's letter of August 25, 1987.

b) Whether plaintiffs are estopped to deny the existence and enforceability of said lease.

c) Whether the original lease is still in effect and enforceable.

## II. STATEMENT OF FACTS

In early 1984, Star Morning Mining Company, hereinafter referred to as 'Defendant,' was formed by Jim Striker, an independent contract miner from the Wallace/Kellogg area. Jim Striker had worked in the Star Morning Mine as an independent contract miner for over 18 years. The Star Morning Mine had been shut down by the plaintiffs in 1982.

On Approximately July 19, 1984, Hecla Mining Company and Bunker Limited Partnership entered into a Lease and Rental Agreement with Star Morning Mining Company. In addition to the Lease and Rental Agreement, plaintiffs also entered into a Marketing Agreement to place concentrates produced by defendant with a smelter. The Star Morning Mine had been shut down for over two years, and the defendant had to performing a substantial amount of restoration before any production of ore. Defendant commenced restoration in May and by September 1, 1984, was capable of producing approximately 250 tons of ore daily. However, plaintiffs had been unable to secure a long-term market for the concentrates by the end of November 1984.

As a result, defendant had to independently seek out and obtain a market for its concentrates. The only market available at the time was with Mitsui in Kobe, Japan. In order to ship concentrates to Kobe, Japan, the ore had to be trucked to Wilma, Washington, barged or rail shipped to Vancouver, Washington, and ocean freighted to Kobe. In early 1987, the defendant commenced shipping to Mitsui. Payment from Mitsui for ore concentrates involved a four month delay. If a market had been available with Cominco, only a three week margin of payment would have existed. From the time of commencing, shipment to Mitsui, the prices of lead, zinc and silver continued to become depressed until, in October 1985, defendant was forced to cease production. The 1984 Lease Agreement included a production requirement of 15,000 tons and 12 months of continuous production; however, plaintiffs never elected to terminate the lease pursuant to these terms until September 1988.

Immediately after the shut-down in October 1985, defendant's representatives and the plaintiffs commenced negotiations regarding continuation and modification of the Lease Agreement. Jay Layman, Operations Manager of the defendant, conferred with plaintiffs' representatives on a monthly, and oftentimes weekly, basis.

Discussions regarding the relationship involved, without limitation:

(1) Itemizing outstanding balance owed plaintiffs, pursuant to Lease;

(2) Restructuring mill charges;

(3) Restructuring tonnage requirement;

(4) Restructuring production requirement;

(5) Review and analysis of defendant's reopening budget and mine plan;

(6) Review and analysis of potential market for concentrates;

(7) Review and analysis of negotiations with the EPA regarding water discharge problems.

The above items were all resolved and included in the August 1987 Agreement.

In the August Agreement, the parties specifically restructured the production requirement by inserting a minimum royalty. Plaintiffs Exhibit 8, the August 25, 1987 letter, indicates and outlines that they understood the impossibility of production until a market was obtained.

Immediately after shutdown in 1985 until August of 1987, plaintiffs and defendant negotiated the terms of a new agreement. There were numerous meetings, exchanges of drafts and consultations with government bodies to resolve the negotiation. On August 20, 1987, John G. Layman, Jay S. Layman, William J. Grismer, and Michael B. White met and agreed to the terms of the agreement. On August 25, 1987, Mike White sent a letter along with the terms of the agreement to be executed upon Star Morning Mining Company entering into a marketing agreement.

During these negotiations and culmination of the terms to the agreement, Hecla representatives indicated that they had the authority and right to enter into the agreement on the property since Bunker Hill Limited was in default with Hecla on its agreement regarding the property.

Documents produced pursuant to Request for Production on January 20, 1990, demonstrate the chronology of events:

1. August 14, 1987, Hecla memo from Michael B. White, attorney, to William J. Grismer, Vice President, Gordon H. Walde and Colleen D. Kelley regarding meeting with Star Morning Mining Company on August 20, 1987—Outline agenda of meeting. Exhibit A1.

2. July 24, 1987, letter from Colleen D. Kelley, Hecla Senior Environmental Engineer to Ms. Florence Carroll, U.S. Environmental Protection Agency, regarding modification of permit—allowing Star Morning Mining Company to re-open mine and operate mill—stating Star Morning Mining Company will be acting as Lessee. Exhibit A2.

3. September 9, 1987, Hecla memo from William J. Grismer to Michael B. White regarding telephone conference with Jerry Layman indicating that Cominco had a backlog after strike—possible 18 month delay—Star Morning Mining Company looking for other market—requested approval to speak with Bunker Hill regarding joint shipments of concentrate—approval given—Jerry Layman indicates that they want to start up as soon as they find a market—financing in place. Exhibit A3.

4. November 6, 1987, letter from G.H. Walde, Hecla, to Jack Swanson, Bunker Limited Partnership, regarding Star Unit potential reserves—Star Morning Mining Company decreased value of property and mining plan. Exhibit A4.

5. May 16, 1988, Hecla IOM from Darrell Wicks to Fred Sayer regarding update status of Star Morning mining Company lease: a) review lease to determine if it should be terminated, b) major reason Star Morning Mining Company unable to renew lease—lack of smelter agreement, c) legal position not to terminate previous contract—wait for Star Morning Mining Company to negotiate new contract and redate that. Exhibit A5.

6. June 3, 1988, letter from Arthur Brown, President of Hecla, to Jack Kendrick, President of Bunker Limited Partnership, regarding recent meeting concerning discussion of Bunker Hill acquiring or leasing Star Morning Mine. Explains that delay is working to their favor because of mineral prices. Exhibit A6.

7. June 27, 1988, letter from J.W. Kendrick, President Bunker I–MI Mining Company, to Arthur Brown, President of Hecla, regarding acquiring Hecla's interest in the Star. Exhibit A7.

8. August 4, 1988, Hecla IOM to Bill Grismer from G.H. Walde regarding telephone call from Jay Layman concerning rumors that Bunker Hill was going to ship Star concentrates to Cominco—I told him I knew nothing about it—Jay stated Cominco was going ahead with expansion and was counting on the Star concentrates. Exhibit A8.

The facts are clear that plaintiffs, through their operating partner, Hecla, with Bunker Hill's approval, negotiated and entered into a new agreement to be executed upon obtaining a smelter agreement. In 1988 the price of zinc increased; Bunker Hill, based upon Star Morning Mining Company data released to Hecla during negotiations, decided to re-open the mine itself.

In late 1986 plaintiffs requested defendant assist in repairing tunnel cave-ins as if the Lease Agreement were in effect. In late 1985 plaintiffs allocated proceeds from Jim Striker's independent contract work for the Lucky Friday to defendant's lease obligations. In the spring of 1987 plaintiffs requested defendant to assist in altering the water discharge to satisfy EPA demands.

Defendant's representatives understood that Bunker Hill, Ltd. was kept informed of the negotiations. In fact, Bunker Hill,

pursuant to its requests for production, had been receiving copies of the drafts of the lease negotiations for 1987. Jay Layman had numerous conversations with Frank Breidt of Bunker Hill Limited regarding negotiations and marketing concentrates. Mr. Breidt never informed Jay Layman that Bunker Hill Limited disapproved of any of the terms of the July 1987 Lease.

After July 1987, defendant continued to operate and function with plaintiffs' acquiescence that the Lease was in effect. Defendant was in contact with plaintiffs' representatives on a monthly basis regarding the ongoing smelter negotiations with Cominco, Mitsui in Japan, and J. Ahrens & Co. Plaintiffs requested that defendant provide a complete mine plan, including budget, financing and reserve allocation. Defendant secured the financing to reopen the mine by obtaining a smelter agreement and confirmed this with plaintiffs.

On November 4, 1987, Jay Layman met with Hank Walde to inform Hank Walde and Frank Breidt of Bunker Hill Limited of the proposal from J. Ahrens regarding a marketing agreement since Cominco had an overload of concentrates. At that time, the initial decision was made with Walde and Breidt that there was not sufficient margin to justify operation at the present prices.

On March 15, 1988, Jay Layman informed Hank Walde and Frank Breidt that Cominco had a renewed interest in receiving concentrates and that a potential marketing agreement was forthcoming. On April 4, 1988, Jay Layman spoke with Frank Breidt to discuss shipping to Cominco or potential joint shipments to Japan. On May 25, 1988, Jay Layman reported on the Cominco expansion and need for concentrate to both Frank Breidt of Bunker Hill Limited Partnership and Hank Walde of Hecla. On July 15, 1988, Jay Layman had phone conversations with Frank Breidt and Hank Walde concerning Cominco.

On August 5, 1988, Jay Layman spoke with Hank Walde of Hecla regarding rumors that a lease agreement had been entered into with Bunker Hill for the operation of Star Mining Company; Hank Walde denied any such rumor.

Based upon the agreements and plaintiffs' representations, defendant entered into settlement negotiations with creditors and defended litigation in Portland with Acme Trading Company, expending over $40,000 in legal fees.

## III. ARGUMENTS AND AUTHORITIES

### A. Standards and Requirements for Summary Judgment.

A motion for summary judgment is proper only when 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' I.R.C.P. 56(c). *Jones v. EG & G Idaho Inc.*, 111 Idaho 591, 726 P.2d 703 (1986). The court must liberally construe the facts in the existing record in favor of the nonmoving party. *Anderson v. Ethington*, 103 Idaho 658, 660, 651 P.2d 923 (1982).

The court must look to the 'totality of the motions, affidavits, depositions, pleadings, and attached exhibits,' not merely to portions of the record in isolation. *Central Idaho Agency. Inc. v. Tumer*, 92 Idaho 306, 310, 442 P.2d 442 (1968). A motion for summary judgment must be denied if the evidence is such that conflicting inferences can be drawn therefrom and if reasonable men might reach different conclusions. *Lundy v. Hazen*, 90 Idaho 323, 411 P.2d 768 (1966). All doubts and all favorable inferences which may reasonably be drawn from the evidence will be resolved against the party moving for the summary judgment. *Id.* Circumstantial evidence can create a genuine issue of fact. *Petricevich v. Salmon River Canal Co.*, 92 Idaho 865, 868–69, 452 P.2d 362 (1969).

The facts clearly indicate that plaintiffs negotiated and agreed upon terms for a 1987 lease agreement to be executed upon defendant obtaining a smelter agreement. The issues raised by plaintiffs should be reviewed by the trier of fact because genuine issues of material fact exist.

*B. A Question of Fact Exists Regarding Whether the August 25, 1987 Agreement is a Binding and Enforceable Contract.*

The terms of the August 1987 Lease Agreement had been agreed to by all parties concerned on August 20, 1987. Hecla Mining Company and Bunker Hill Limited Partnership, by their affirmative actions, silence and inaction, operated as an acceptance to the lease agreement.

Plaintiffs set forth the position that their silence after August 25, 1987 does not constitute an acceptance. Plaintiffs argue that they were silent as to the lease offer; however, in actuality, they made the offer and, as previously outlined, affirmatively initiated a course of conduct demonstrating that new lease terms had been agreed to. They rely upon *Vogt v. Madden*, 110 Idaho 6, 9, 713 P.2d 442 (1986) to support the position that silence or non-action does not constitute acceptance of an offer. This argument is misplaced as the facts demonstrate that, to the contrary, plaintiffs: 1) conveyed the agreed to terms to defendant accompanying Mike White's August 25, 1987, letter; 2) plaintiffs were not silent as to the agreement as set forth in Jay Layman's Affidavit (Exhibit B) and in Exhibit A, attached hereto, which consists of documents produced pursuant to requests for production; 3) the Vogt analysis of silence does not apply to the plaintiffs in this circumstance. In the event the court holds that the Vogt analysis applies, the entire case should be considered, including its exceptions which were adopted from the *Restatement 2d of Contracts*, § 69 (1981):

(a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation;

(b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree remaining silent and inactive intends to accept the offer;

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror that he does not intend to accept.

Plaintiffs took the benefit of the offer of services from defendant. Plaintiffs relied upon defendant's services with reasonable time to reject in the following areas without limitation:

1. EPA negotiations;

2. Restoration of discharge problem;

3. Repair of cave-ins in the mine;

4. Improperly seizing profits from CSC Mining Co., a partner in the Star Morning Mining Company as debt to Hecla and Bunker Hill Limited Partnership, pursuant to the lease agreement;

5. Seizing of equipment left in the mine as a result of Star Morning Mining Company's reliance upon the lease agreement being in effect;

6. Review and use of Star Morning Mining Company's marketing negotiations with Cominco and other smelters;

7. Use and review of Star Morning Mining Company's mining plan and budget;

8. Use and benefit of the substantial reserves created by Star Morning Mining Company's efforts.

Contrary to plaintiffs' assertions, their actions demonstrated to defendant that a new lease agreement had been reached and encouraged defendant to act as if the lease were in effect.

Finally, the prior dealings of the plaintiffs and defendant made it reasonable that plaintiffs should have terminated the 1984 and 1987 lease agreements if they did not believe they were in effect. Since 1984, defendant and plaintiffs had an ongoing working relationship in which plaintiffs encouraged defendant to continue to perform work which benefited the Star Morning Mine an asset of plaintiffs. Plaintiffs were aware throughout the continuous negotiation process that a smelter agreement was essential for execution of the lease document

It is clear that a question of fact exists whether or not the 1987 agreement is in force.

*C. Bunker Limited's signature was not a condition precedent to the contract and if so, they are estopped from asserting such a position*

Plaintiffs allege that Bunker Hill Limited's signature was a condition precedent to the contract being valid. The facts indicate that if it was a condition precedent, Bunker Hill Limited's silence and actions as previously set forth caused defendant to rely upon their acceptance.

Bunker Hill Limited was aware of and participated in negotiations regarding the terms of the 1987 Agreement and had approved such terms.

Jay Layman of Star Morning Mining Company, both before and after the August 25, 1987 agreement, had numerous phone conversations with Frank Breidt of Bunker Hill Limited, concerning their activities and plans with the Star Morning Mine. Neither Frank Breidt nor anyone else from Bunker Hill Limited Partnership ever indicated to the Star Morning Mining Company representative that the 1984 lease, or its replacement of August 25, 1987, was not in effect or was going to be cancelled.

Hecla representatives told defendant that they had the authority to agree to the terms of the 1987 agreement because Bunker Hill was in default with Hecla on their underlying agreement on the property.

*World Wide Lease, Inc. v. Woodworth,* 111 Idaho 880, 728 P.2d 769 (Ct.App.1987), relied upon by the plaintiffs, indicates that condition precedents are not favored by the courts, and that the conduct of the parties may be a factor in the analysis of the existence of the condition precedent.

Bunker Hill Limited Partnership was aware of the terms of the 1987 Lease Agreement prior to August 25, 1987. Bunker Hill Limited Partnership's oral communication actions and silence after August 25, 1987 indicated its approval of the Agreement and defendant's reliance.

The court in *World Wide Lease Inc.* goes on to point out that whether or not the parties intended something to be a condition precedent is a question of fact. *Id.,* at 777. Consequently, this issue should be addressed by the trier of fact and not ruled upon during the motion for summary judgment.

*D. Plaintiffs Are Estopped By the Doctrines of Promissory and Quasi Estoppel to Deny the Existence of a Valid and Enforceable Lease Agreement*

The facts are clear that plaintiffs and defendant negotiated new terms and reached agreement as to those terms in August of 1987. Mike White sent an offer of these terms in a Lease Agreement on August 25, 1987. This agreement was orally accepted by the defendant. It was agreed that it would be formally executed when Star Morning Mining Company entered into a smelter agreement.

Cominco suffered a labor strike from May through September of 1987, and the parties agreed to sign the documents upon obtaining a market. The mine could not go into production without a market. Defendant relied upon plaintiffs' words and conduct and plaintiffs are estopped from now asserting that they did not enter into such agreements.

The doctrine of promissory estoppel requires reliance upon a specific promise. *Restatement (Second) of Contracts,* § 98 (1979).

A party seeking to avail itself of the doctrine of promissory estoppel must show that:

(1) the detriment suffered in reliance was substantial in an economic sense;

(2) substantial loss to the promisee acting in reliance was or should have been foreseeable by the promisor; and

(3) the promisee must have acted reasonably in justifiable reliance on the promise as made. *Gilbert v. City of Caldwell,* 112 Idaho 386, 732 P.2d 355 (Ct.App. 1987); citing *Mohr v. Shultz,* 86 Idaho 531, 540, 388 P.2d 1002, 1008 (1964).

Defendant reasonably relied upon the promise of plaintiffs that defendant would be able to continue development and opera-

tion of the Star Morning mine when a marketing agreement had been completed and a market for concentrates could be secured. Should plaintiffs prevail in their effort to terminate the lease agreement with defendant, defendant will suffer catastrophic economic detriment. Plaintiffs were well aware of the efforts of defendant to rehabilitate the Star Morning Mine in preparation for reopening the mining operation. In addition, defendant kept plaintiffs constantly advised as to defendant's efforts to find a solution to the water discharge problems, to secure a market for concentrate and to settle the Acme controversy.

Defendant advised plaintiffs almost monthly as to defendant's expenditure of time and money to rehabilitate the mine, to secure a market for ore concentrate, to solve the water discharge problems and to secure financing for its mining operation. Plaintiffs should have reasonably foreseen that defendant's investments would produce substantial loss if the rights to mine the Star Morning mine were terminated.

Plaintiffs are estopped to deny that their promises and conduct caused defendant to undertake efforts to rehabilitate the mine and market the ore. The intention of plaintiffs as to the modification of the terms of the 1984 Lease Agreement and the implementation of such terms is immaterial.

> In estoppel a barrier is simply set up regardless of the parties' intentions which precludes one from asserting a right he would otherwise have but for the matters and things pleaded by the way of estoppel, if such matters and things are properly pleaded and proven. *Seaport Citizens Bank v. Dippel,* 112 Idaho 736, 735 P.2d 1047 (Ct.App.1987).

After plaintiffs attempted to terminate the lease, Star Morning Mining Company representatives were told that Hecla had changed its mind and did not want to continue as a lessor of the Star–Morning mine; but instead, wanted to sell the mine to Bunker Hill to recoup a pre-existing debt owed to Hecla by Bunker Hill. The purpose of the doctrines of promissory and quasi estoppel are to prohibit an individual from securing some advantage for himself, or to produce some disadvantage to the persons seeking the estoppel, after a party has been induced to change his position. *Carrier Clearing Services v. Ore–Ida Foods,* Inc., 110 Idaho 133, 714 P.2d 102, 103 (Ct.App.1986); citing *Tommerup v. Albertson's, Inc.,* 101 Idaho 1, 607 P.2d 1055 (1980). In addition, it would be unconscionable to allow a party to maintain a position which is inconsistent with the position they had taken in order to secure a benefit. *Id.*

The substantial benefits accrued to plaintiffs as a result of the rehabilitation, permitting, and marketing efforts of defendant are evidenced by the fact that plaintiffs have begun operation of the Star Morning Mine. (See affidavit of Jay Scott Layman, Operations Manager, Exhibit B.) In addition, plaintiffs are benefitted by the mine development and marketing research performed by defendant. It would be unconscionable to permit plaintiffs to terminate the lease relationship with defendant after defendant had changed its position in reliance upon the promises and conduct of plaintiffs. Plaintiffs should be estopped from their efforts to terminate the 1984 and 1987 Lease Agreements thereby ousting defendant from its rightful leasehold possession of the Star Morning mine.

### E. Plaintiffs have waived their right to unilaterally terminate the July 19, 1984 Agreement

Plaintiffs allege that on September 16, 1988 they had the right to terminate the lease of July 19, 1984, based upon the 15,000 ton and the twelve consecutive month production requirements. However, defendant maintains that if the 1987 Lease is held not to be valid, then a genuine issue of material fact exists as to whether plaintiffs have waived their ability to make such a termination.

In *Riverside Development Co. v. Ritchie,* 103 Idaho 515, 650 P.2d 657, the Court held:

> The existence of waiver ordinarily is a question of fact and if there is any sub-

stantial evidence in the record to support a waiver it is for the trier of fact to determine if the evidence establishes such a waiver.

*Id.* 660.

The court went on to hold that 'an intent to waive a right may, however, be established by conduct.' *Id.* 662.

Plaintiffs allowed defendant to continue to work on reopening the Star Morning Mine, from the time it shut down in 1985 until Notice of Termination on September 16, 1988. Defendant detrimentally relied upon plaintiffs' actions and representations. Plaintiffs benefited substantially from the actions of defendant, without limitation, in rehabilitation of the mine, use of mine development plan, marketing contract negotiations, and establishment of additional reserves.

The intent of the plaintiffs to waive these two requirements is clear in the 1987 draft and August 25 letter of Mr. White, Exhibit 8. The plaintiffs realized that defendant had no control over the market, nor the economic price of the minerals mined.

Idaho courts have set forth in *Riverside Development Co., Id.* that question of intent must be judged on a situational case by case basis. *Id.* 663. A genuine issue of material fact exists whether or not plaintiffs waived their rights of termination, pursuant to the 1984 agreement.

The plaintiffs continued negotiations and requests for defendant to perform work on the leased property constituted such a course of conduct as to waive strict compliance with the terms of the lease. The plaintiffs' continued acceptance and recognition that Star Morning's inability to mine twelve months continuously, or to produce 15,000 tons, were factors beyond their control, dictated by the price of metals and the market available. In *Riverside Development Co., Id.,* the Idaho courts set out that 'a continuing course of conduct by a lessor which misleads a lessee to his prejudice in regard to the lessor's intent to strictly enforce the terms of the lease may constitute a waiver.' *Id.* 664.

Plaintiffs' continued course of conduct from October 1985 misled defendant to its prejudice in regard to plaintiffs' intent to strictly enforce the termination clause in the 1984 agreement, and as a result, should constitute a waiver. A genuine issue of material fact exists as to whether or not plaintiffs' course of conduct constitutes a waiver.

As a part of this allegation, plaintiffs argue that they may hold defendant to the letter of the termination provisions of the 1984 Lease. They cite to *Nichols v. Knowles,* 87 Idaho 550, 394 P.2d 630 (1964), and *Howard v. Bar Bell Land & Cattle Co.,* 81 Idaho 189, 340 P.2d 103 (1959) for the proposition that courts must 'respect the provisions of a contract lawfully agreed to.' A closer look at both of these cases shows that where the provisions of a contract, when strictly applied, would cause a forfeiture and a resulting unconscionable penalty, equity will intercede to grant relief. *Nichols v. Knowles,* 87 Idaho 550, 394 P.2d at 633; *Howard v. Bar Bell Land & Cattle Co.,* 81 Idaho 189, 340 P.2d at 107. The Idaho Supreme Court in both *Nichols* and *Howard* cite to *Graves v. Cupic et al.,* 75 Idaho 451, 272 P.2d 1020 (1954). *Graves* clearly states that forfeitures are abhorred by the courts. *Id.,* 272 P.2d at 1023.

The repercussions to defendant caused by a summary judgment forced forfeiture of its rights under the lease of the Star Unit Area would be economically catastrophic and grossly unconscionable. Equity should not grant specific performance of a forfeiture unless the failure to do so would lead to an unconscionable result. *Id.* The denial of plaintiffs' motion for partial summary judgment, and thus permitting the controversy between the parties to go to a trial on the merits would be far from an unconscionable result. In fact the reverse would be true.

Plaintiffs claim that there can be no oral or other modification of the termination provision of the 1984 Lease. Plaintiffs cite to *Triangle Mining Company v. Stauffer Chemical Co.,* 753 F.2d 734, as authority for this argument. 753 F.2d 734, 739 (9th Cir.1985). *Triangle Mining Company* is

clearly distinguishable from this case. In the first place, the termination clause in the Triangle Mining Company/Stauffer Chemical Company mining contract was an unqualified right to terminate without cause. In addition, the bilateral right to terminate was inserted solely to secure tax benefits for both parties and had nothing to do with performance under the contract. Secondly, the Triangle Mining contract contained two liquidated damage clauses to protect the parties equally in case of termination. *Triangle Mining Company*, at 736. The effect of the liquidated damage clauses was to return the parties to their pre-contract position no matter which party evoked the termination provision. It would be unreasonable to attempt to compare the factual pattern of *Triangle Mining Company* to the present mining lease arrangement.

Plaintiffs additionally point out that the *Triangle Mining Company* court held that 'there is no implied obligation of good faith preventing termination.' It should be noted that the 'Idaho courts have yet to decide whether contracts generally contain an implied obligation to act in good faith or whether good faith or reasonableness condition [an] otherwise unrestricted power of termination.' *Triangle Mining Company*, at 738; citing *Scott v. Castle*, 104 Idaho 719, 662 P.2d 1163, 1167 (Ct.App.1983). Therefore, as plaintiffs note, defendant did not allege bad faith. Based upon both *Triangle Mining Company* and *Scott*, defendant argues that the obligations of good faith are tied to the intent of the parties. *Triangle Mining Company, Id.* at 739; *Scott v. Castle, Id.*

The Ninth Circuit Court of Appeals in *Triangle Mining Company* clearly sets forth a concept which is essential to the review of the termination controversy in the case at bar. To quote:

The requirement of reasonableness is read into a contract not to protect the weaker party but to approximate what the parties would have expressly provided with respect to a contingency that they did not foresee, if they had foreseen it.

*Id.,* at 739.

Defendant alleges in its Answer, and argues here, that the basic assumptions of the termination provisions of the 1984 Lease had been modified by oral agreement of the parties to be executed upon the obtaining of a marketing agreement. Said modification caused defendant to expend substantial sums in reliance upon the promises by plaintiffs that there would be no precipitous termination of the 1984 Lease. The necessity for the modifications was to address late developing contingencies that were not foreseen by the parties at the time of the execution of the 1984 Lease.

The parties to an unperformed contract may, by mutual consent, modify if by altering, excising or adding provisions, and such modification may be by parol agreement though the contract is in writing. *Ore–Ida Potato Products, Inc. v. Larsen*, 83 Idaho 290, 362 P.2d 384, 385 (1961). The fact of an agreement to modify may be implied from the course of conduct of the parties. *Id.* 362 P.2d at 387. Consent to a modification of a prior written contract may be implied from a course of conduct consistent with the asserted modification. *Resource Engineering, Inc. v. Siler*, 94 Idaho 935, 500 P.2d 836, 839 (1972); citing *Ore–Ida Potato Products, Inc.* The question of whether an alleged oral modification is proven is on for the trier of fact to decide. *Id.*

It is clear that abundant questions of fact concerning modification of the termination clause in the 1984 Lease must be addressed by a trial court. In order to determine whether the parties reached a mutual understanding for modification, the trial court will need to examine all competent extrinsic evidence relating to the understandings and agreements of the parties. *Shields & Company, Inc. v. Green*, 100 Idaho 879, 606 P.2d 983, 986 (1980). It is well settled in Idaho that parties to a written contract may modify its terms by subsequent oral agreement or may contract further with respect to its subject matter. *Scott v. Castle*, 662 P.2d at 1168; citing

*Silver Syndicate, Inc. v. Sunshine Mining Co.*, 101 Idaho 226, 611 P.2d 1011 (1979).

## CONCLUSION

Defendant respectfully requests that the Court deny plaintiffs' Motion for Partial Summary Judgment. There remain many genuine issues of material fact concerning the status of the 1987 Lease and the 1984 Lease.

R. 43–58.

### EXHIBIT A1 (R. 59)

### HECLA MINING COMPANY

August 14, 1987

MEMORANDUM TO: William J. Grismer

MEMORANDUM TO: Gordon H. Walde

MEMORANDUM TO: Colleen D. Kelley

FROM: Michael B. White

SUBJECT: Striker/Star Morning Mine Lease

I have set a tentative meeting with Jay Layman to discuss the status of the company's proposed lease with Star Morning Mining Company for Thursday, August 20 at 9:00 a.m. here in our offices. Apparently Jerry Layman will be unavailable for the meeting but Jay indicated that he would try to have Jim Striker available. The purpose of the meeting is to review the following matters:

1. Status of their financing;

2. Status of Hecla's request to EPA to separate the NPDES permit for water discharges from the Star tailings impoundments and the Morning portal;

3. The draft agreement;

4. The status of Striker's proposed operations and smelting agreement.

I would appreciate your advice concerning whether you will be able to attend a meeting on the 20th.

MBW: ldr

### EXHIBIT A2 (R. 60)

July 24, 1987

Ms. Florence Carroll
U.S. Environmental Protection Agency
Water Compliance Section, WD135
Region 10, 1200 Sixth Avenue
Seattle, Washington 98101

Re: NPDES Permit No. ID–000167, Request for Modification, Star–Morning Complex

Dear Ms. Carroll:

Hecla Mining Company wishes to request a modification to NPDES Permit No. ID–000167 for the Star–Morning Complex. Hecla wishes to split the permit with separate permits issued for each outfall, enabling the Star side of the mine to resume an operating mode while not affecting the Morning side of the mine which will remain in the shutdown mode. This will allow the Star–Morning Mining Company (SMMC) to reopen the mine and operate the mill, using the Star tailings ponds.

SMMC expects start up operations to commence in late September with approximately 30 days required to reach full production. The mill will be run on a campaign basis, approximately 2–3 days per week. It is SMMC's intention to divert all operating water out the Star side of the mine to the tailings ponds. SMMC would be acting as a lessee of the mine and responsibility for discharge compliance would remain with Hecla Mining Company.

Please call me if you should need further information.

Sincerely,
Colleen D. Kelley
Senior Environmental Engineer

CDK:ld

cc: Bill Boyd

cc: Jay Layman

### EXHIBIT A3 (R. 61)

September 9, 1987

MEMORANDUM TO: Michael B. White

FROM: William J. Grismer

SUBJECT: Star–Morning Mining Company

This afternoon, I received a call from Jerry Layman concerning reopening the Star mine. He said that, as we know, they had hoped to be able to ship to Cominco at Trail following settlement of the strike. They were informed today, however, that Cominco has determined that they have a major backlog of concentrates available, particularly with respect to zinc concentrates from the Pine Point property, so that they could not take anyone's concentrates for 18 months—meaning particularly zinc and to include lead.

Jerry said they must now look for another market and have spoken to Acme Trading in Portland about again shipping to Mitsui in Japan. He noted that they would also like to speak to Bunker Limited inasmuch that they have heard that a rumor is afloat that the Bunker Hill mine would be reopened. They hope that between the Bunker and the Star–Morning mine, they might have a sufficient quantity to be able to sensibly deal in Japan. Jerry wanted to know if it was all right if they spoke to Bunker and I told them certainly that was fine and suggested that he speak to Jack Kendrick.

Jerry said that as soon as they can find a market, they will want to start up the Star operation. He also noted they now have their financing arranged but are, as noted above, now blocked by a market for the products.

WJG: sb

cc: A. Brown
cc: R.B. Kahler
cc: G.H. Walde
cc: N.M. Tower

EXHIBIT A4 (R. 62–63)

November 6, 1987

Mr. Jack Swanson
Bunker Limited Partnership
P.O. Box 29
Kellogg, Idaho 83837

Dear Jack,

At our meeting last Monday, we discussed the Star Unit Area potential ore reserves, ground conditions, environmental considerations, equipment availability, condition of the physical plant, and Striker's plans.

The ore reserves, since 1983, above the 2000 L have been-increased due to the addition of the 1100 Noonday North Split ore which has a strike length of 600 ft and the addition of 400 ft of high grade zinc ore on the 2000 Main Vein (South Split).

Striker's plan is to continue mining from the 2000 L and above without any development until he can pay off his current debts. When the debts are paid, he will dewater the #4 shaft to the 5300 L, and mine the high grade silver stope that is called the 5300 East Noonday vein. Striker will probably make a stock offering to help pay for the mine dewatering, 5300 L development, and 5300 L pump station.

In August of 1987, the E.P.A. granted the Star–Morning permission to operate the Star and the Morning discharges independently in either the active or inactive mode. As you know, the restrictions during the active mode are much more severe than the inactive mode. The discharge during the last 6 months (inactive) has shown a marked decrease in heavy metals and no non-compliance reports have been required.

The systems for the operation of the mine are all in place for the operation of the mine above 2000 L. Power lines to the mill will require repair before operations can be started. The compressed air system, haulage system, the concentrator, sandfill system, dry accommodations, and the hoisting system above 2000 L are all operable. The main portal has one small cave that covers about 20 ft which will require 3 days repair.

I am enclosing ore reserve data that is probably duplication of data that is in the Bunker Hill files, but might-be of immediate interest.

Jack, I have set a tentative date of November 19 for a trip to the Lucky Friday so that we can observe the underhand stoping system at the property.

Sincerely,
G.H. Walde
Manager—Special Project

GHW:ld

Enclosure

c: W.J. Grismer

EXHIBIT A5 (R. 64)

## HECLA MINING COMPANY

May 16, 1988

MEMORANDUM TO: Fred Sayer

FROM: Darrell Wicks

SUBJECT: Star Unit Area—Update on the Status of the SMMC

SUBJECT: Lease Agreement

I have reviewed the SMMC lease agreement with the Star Unit Area to determine if the contract should possibly be terminated or if any other changes should be made. I recommend that no major changes at this time be made from an accounting standpoint, but do suggest the Accounting Department be advised monthly on the status of the SMMC situation from Hank Walde.

The Star Morning Mining Company began production under the lease agreement with Star Unit Area in 1984, ceased production in 1985, and was on a standby status through July 30, 1987. In June 1987 the accounts receivable balance was written off (per WJG). The amount owed Hecla at that time was $395,773.93 with the following detail: Star accounts receivable = $330,342.62 and Hecla Shop accounts receivable = $65,431.31. Even though Hecla wrote off this SMMC accounts receivable as uncollectible, SMMC was not released of their debt owed to Hecla.

The major reason why SMMC has been unable to renew their lease option at the Star, since they ceased production in 1985, seems to be finding a smelter who is willing to purchase their zinc concentrate. The previous smelter, in British Columbia, Cominco has told SMMC they currently have stockpiles of 1½ to 2 years of zinc concentrate to process; therefore, currently SMMC has no buyer for their zinc concentrate.

I have discussed the SMMC contract with Mike White as to the possible termination of the previous contract or how we should treat the current SMMC situation. The legal position Hecla wants to take with SMMC is not to terminate the previous contract, but to wait for SMMC to negotiate a new contract and repay their original debt of $395,773.93.

DEW:jmd

EXHIBIT A6 (R. 65)

June 3, 1988

Mr. Jack Kendrick, President
Bunker Limited Partnership
Box 29
Kellogg, Idaho 83837

Dear Jack:

At the conclusion of our recent meeting regarding the Star situation, I promised to send you a letter outlining a proposal under which Hecla would divest of its interest in the Star Mine. I promised to have such a proposal to you by the end of the month. My staff has completed the work I asked them to do and they have some specific recommendations. Unfortunately, I have been traveling and have not been able to review their recommendations. I will be out of the office all next week also, so it now appears unlikely that I will be able to respond to your request before the end of the week ending June 17.

I am sorry about the delay, but I am sure that you are busy with a number of other pressing start-up problems and this item is probably not at the top of your agenda. On the other hand, it seems that the delay is working in our favor. The price of metals is strong and rising and, if this trend continues, with it the value of our share of the old mine. Thank you for your patience.

Very truly yours,
Arthur Brown
Chairman and
Chief Executive Officer

AB sk

EXHIBIT A7 (R. 66)

June 27, 1988

Mr. Arthur Brown
President
HECLA MINING COMPANY

6500 Mineral Drive, Box C–8000

Coeur d'Alene, ID 83814

Dear Art:

Thank you for your letter of June 17 regarding the Possibility of acquiring Hecla's interest in the Star Unit Area; it provides a useful framework for our future discussions.

I will be travelling in Canada most of this week and hope to take a few days off following the Fourth of July. Nevertheless, this is a top-priority matter and I'm hopeful that I can get back to you during the week of July 11.

Thank you.

Sincerely,

BUNKER HILL MINING COMPANY (U.S.) INC.

J.W. Kendrick

President

JWK:nm

EXHIBIT A8 (R. 67–68 HANDWRITTEN)

August 4, 1988

MEMO TO: Bill Grismer

FROM:    G.H. Walde

SUBJECT: Telephone call from Jay Layman

*Bill:* Jay Layman called about 11:30AM today to ask about some rumors he had heard at the Hecla Shop concerning the Bunker Hill. The rumor was that the Bunker Hill had contract with Cominco and was going to ship Star Concentrates and Bunker Hill Concentrates. I told him I knew nothing about this.

I asked him how he was doing with Cominco and he said that Cominco had decided to go ahead with their expansion plans and Cominco was counting on Star Concentrates. Jay thinks that cominco will offer them a contract. At that time Layman–Striker will approach us concerning a new lease at the Star.

1983 Preliminary by Ned

Preliminary by Ned Tower Apr. 1982.

1984 Mine lease—Jul 19, 1984

Mill Rental

1985 Summer = Equipment Purchases

See Ells files

Fall of 1985 out of business

1986 Jan. Letter from Layman ) settle debt

phone to Art Brown ) settle debt

Cominco contract

Memo to MBW, Jan. 6–87

Preliminary by Striker Dec. 86

1987 Draft of new Agreement

12 month no active mining

Memo to MBW Jan. 6 87

Cominco told Striker that they would not take concentrates for 18 months

During 1988 Jay Layman called occasionally & I kept in contact as to their negotiations with Cominco

Summer 1988

About the time Kendrick approached Hecla, Cominco talked about expansion and told Jay that maybe they would get contract. I think I wrote hand written memo to W.J.G. to that effect.

I used to see Striker in Wallace and ask him how things were going.

R. 67–68.